**Gabriel FAGOT RODRIGUEZ, et al., Plaintiffs,**

v.

**THE REPUBLIC OF COSTA RICA, et al., Defendants.**

**No. CIV. 93–2406(DRD).**

United States District Court, D. Puerto Rico.

March 19, 2001.

Victor J. Casal–Vazquez, Hato Rey, PR, Jose G. Fagot–Diaz, Martinez Odell & Calabria, San Juan, PR, for plaintiffs.

Salvador Antonetti–Zequeira, Heriberto J. Burgos–Perez, Fiddler, Gonzalez & Rodriguez, San Juan, PR, A.J. Bennazar–Zequeira, A.J. Bennazar Law Offices, Hato Rey, PR, Veronica Ferraiuoli–Hornedo, McConnell Valdes, San Juan, PR, for defendants.

### *OPINION and ORDER*

DOMINGUEZ, District Judge.

In an Opinion and Order dated March 31, 2000, the Court entered summary judgment (Docket No. 127) against defendants that included damages, interest, attorneys' fees and costs. Part of the award was payable by all defendants, jointly and severally, while the remainder was payable solely by Defendant Fourniers' in their individual capacity. In response, prevailing Plaintiffs filed a Motion for Reconsideration of Judgment (Docket No. 128) requesting that the Court extend joint and several liability to Defendants Republic of Costa Rica and its Consulate in Puerto Rico for all damages, regardless of the underlying legal theory. After careful consideration of the jurisdictional basis for Plaintiffs' claim, the Court **VACATES** its Opinion and Order dated December 29, 1999 (Docket No. 119), its Opinion and Order dated March 31, 2000 (Docket No. 126), and its Judgment entered March 31, 2000 (Docket No. 127). Plaintiffs' Motion for Reconsideration of Judgment (Docket No. 128) is **DENIED.**

The Court now finds that during the relevant period, there never existed a contractual relationship, based on agency theory or otherwise, between Costa Rica and the Consulate, on one part, and Plaintiffs Fagot, on the other. Therefore, none of the exceptions to the Foreign Sovereign Immunities Act are applicable to the instant case, and the Court must correspondingly **DISMISS** the claims against the Republic of Costa Rica and its Consulate in Puerto Rico for lack of subject matter jurisdiction, and **DISMISS** the claims for trespass against Defendant Fourniers.

## I. FACTUAL BACKGROUND

In June of 1993, a garden variety tenant-landlord dispute over a faulty air conditioner broke out between the Plaintiffs Fagots and the Defendants Fourniers. Today, seven years, four published decisions, and hundreds of attorney-hours later, the Court finally puts to rest the above-captioned international legal saga. On September 25, 1991, the Fagots and the Fourniers executed a lease agreement whereby the Fagots leased a residential property located in the upscale Santa Maria neighborhood in Rio Piedras. The lease term was two years, from October 1, 1991 to September 30, 1993, and required a monthly rent of $2,500.00, due on the fifth day of every month. At the time, Mrs. Hilda Fournier Alpiza and Mr. Angelo Antonio Greco Fournier served as Consul and Vice Counsul, respectively, of the Republic of Costa Rica in Puerto Rico. Notwithstanding, the lease was signed by the Fourniers in their individual capacity, mentioning the Republic of Costa Rica in a single clause which explained that the Fourniers, as consuls, received from the Costa Rican government a monthly residential allowance of $2,000.00, and that any increase in this amount would result in a proportional increase in the monthly rent payable to the Fagots. The lease also required that the property be used exclusively for residential purposes and not be altered or subleased without the owner's written consent. However, without seeking any consent or informing the Fagots, the Fourniers placed the Consulate of Costa Rica in the leased property.

Defendant Fourniers' failed to timely pay the rent due for June of 1993, and to obtain the landlords' consent for the installation of a new air conditioning unit. As a result, the Fagots notified the Fourniers via a letter dated June 16, 1993 (hereafter "June termination notice") (see Exhibit C, Plaintiffs' Opposition to Motions to Dismiss, Docket No. 13) that the lease was terminated and that the Fourniers had to vacate the premises by July 16, 1993. The Fourniers did not vacate the premises by the requested date, but rather tendered to the Fagots a $2,500 check for the June rent, which the latter cashed. However, two months later, on August 19, 1993, the Fagots returned subsequently delivered checks of $2,500 for the months of July and August (see Exhibit C, Plaintiffs' Opposition to Motions to Dismiss, filed March 11, 1994, Docket No. 13) and informed them (hereafter the "August demand letter") that, "inasmuch as there is no lease currently in force fixing the monthly rent, you will hereafter pay for your use and enjoyment of the property a monthly sum of $5,000, retroactive to July 16, 1993, namely the date on which you should have vacated the property" (translation ours, see Exhibit C, Plaintiffs' Opposition to Motions to Dismiss, Docket No. 13). The Fourniers did not vacate the premises or pay the new monthly rent, and on September 30, 1993, the Fagots filed the instant complaint for breach of contract, personal injury, damage or loss of property, eviction, and collection of money.

In an Opinion and Order dated December 29, 1999 (Docket No. 119), this Court granted summary judgment against the Republic of Costa Rica and its Consulate in Puerto Rico. The Court found that defendants Fourniers had, by placing the Consulate within Plaintiffs' property, breached the lease agreement entered into on September 25, 1991. Consequently, the Court held that, by remaining in the property after Plaintiffs' August demand letter, defendants Fourniers had acquiesced to a new month-to-month contract for the requested $5,000 monthly rate. Because Puerto Rican law protects undisclosed principals from joint and several liability for their agents' actions, the Court found Costa Rica and the Consulate jointly liable

only for the 15–month period following August 1993, the time when evidence shows Plaintiffs discovered the Consulate was located in their property (see Transcript of Trial on Default, Docket No. 143). Further, the Court held that the contractual action against Costa Rica and the Consulate was not barred by the Foreign Sovereign Immunities Act because the breach of the new month-to-month contract constituted an unprotected commercial activity exception pursuant to 28 U.S.C. § 1605(a)(2). Finally, the Court held that joint liability for mental distress and property damages against Costa Rica and the Consulate could not proceed under the tortious activity exception to sovereign immunity, 28 U.S.C. § 1605(a)(5), because the logistics and operations associated with the establishment of a consulate fell within the definition of a protected "discretionary function," 28 U.S.C. § 1605(a)(2)(A).

## II. MOTION FOR RECONSIDERATION UNDER FED. R. CIV. P. 59(e)

■ Plaintiffs have filed, pursuant to Fed.R.Civ.P. 59(e), a Motion for Reconsideration of the Judgment (Docket No. 128) issued in the Opinion and Order dated March 31, 2000 (Docket No. 126). Plaintiffs have asked this Court to impose joint and several liability on the Republic of Costa Rica and the Consulate for all damages resulting from the consuls' unauthorized use of the disputed property, for the entirety of their tenancy. In addition, Plaintiffs have challenged the Court's decision that the "discretionary function" safe harbor to the tortious activity exception in the Foreign Sovereign Immunities Act precluded liability in tort for mental distress and property damage against Costa Rica and the Consulate.

In support of their motion, Plaintiffs reiterate their previously advanced trespass theory of recovery. This theory, they emphatically claim, justified recovery in tort against Costa Rica and the Consulate for the *entire period* of their agents' tenancy. Although Plaintiffs' aggressive pleading style makes their precise legal contentions difficult to identify, they appear to make three distinct yet related arguments: (i) that upon refusing to leave when Plaintiffs asked them to, the consuls committed trespass, and that Puerto Rico law makes the legal effect of such trespass retroactive (for the purpose of damages) to the initial entry into the property; (ii) that as soon as Defendant Fourniers commenced their illicit commercial use of the property in contravention of the original lease agreement, Defendant Fourniers effectively trespassed during their entire occupation; and (iii) that irrespective of any agency theory, the mere physical presence of the Consulate on the disputed property constituted trespass for the duration of the tenancy. In addition, Plaintiffs challenge the Court's determination that sovereign immunity applied to absolve Costa Rica and the Consulate of liability due to physical damage to the residence.

■ Motions for reconsideration are entertained if they seek to correct manifest errors of law or fact, present newly discovered evidence, or when there is an intervening change in the law. *See Jorge Rivera Surillo & Co. v. Falconer Glass Indus., Inc.,* 37 F.3d 25, 29 (1st Cir.1994); (citing *F.D.I.C. v. World University, Inc.,* 978 F.2d 10, 16 (1st Cir.1992)); *Cherena v. Coors Brewing Com.,* 20 F.Supp.2d 282, 286 (D.P.R.1998); *see also National Metal Finishing Com. v. BarclaysAmerican/Commercial, Inc.,* 899 F.2d 119, 124 (1st Cir.1990). The Court has substantial discretion in deciding whether to allow the losing party to argue new material or a new theory. *Williams v. Poulos,* 11 F.3d 271 (1st Cir.1993); *see also Polyplastics, Inc. v. Transconex, Inc.,* 827 F.2d 859, 864 n. 4 (1st Cir.1987); *Willens v. University of Massachusetts,* 570 F.2d 403, 406 (1st

Cir.1978); *Pagan v. American Airlines, Inc.,* 534 F.2d 990, 992–93 (1st Cir.1976).

The Court now finds, informed by Plaintiffs' continued assertion of a trespass basis for recovery, that its prior legal determination that Plaintiffs' claim was grounded on a breach of contract was manifestly incorrect. Therefore, the Court is forced to take a renewed, hard look at Costa Rica and the Consulate's claim of sovereign immunity under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604. As the Supreme Court observed in *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (U.S.N.Y.1983), "[a] foreign state is normally immune from the jurisdiction of federal and state courts, 28 U.S.C. § 1604, subject to a set of exceptions," which may render the foreign state liable "in the same manner and to the same extent as a private individual under like circumstances."

■ Since foreign immunity is a matter of jurisdiction, this Court may raise it or re-examine it at any time. Fed.R.Civ.P. 12(h)(3) explicitly states that "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction over the subject matter, the court shall dismiss the action." In the context of foreign sovereign immunity, *see Frolova v. Union of Soviet Socialist Republics,* 761 F.2d 370 (7th Cir.1985) (affirming sua sponte dismissal by district court); *Proyecfin de Venezuela, S.A. v. Banco Industrial de Venezuela, S.A.,* 760 F.2d 390 (2nd Cir.1985) (refusing to consider newly presented facts against subject matter jurisdiction presented by non-sovereign plain-

tiff); *Ferdman v. Consulate General of Israel,* 1999 WL 92917 (N.D.Ill., Feb 17, 1999) (NO. 98 C 1555). *See generally* Wright and Miller, *Federal Practice and Procedure,* Vol. 5A, § 1393 at p. 765–774 commenting that "a defect of subject matter jurisdiction never can be cured or waived by consent of the parties... [and it] may be presented by any interested party at any time, either by motion, or in the answer. Furthermore, it may be interposed as a motion for relief from a final judgment under Rule 60(b)(4) or presented for the first time on appeal." Since Plaintiffs filed a Motion for Reconsideration of Judgment under Fed.R.Civ.P. 59(e), within ten days from entry of the Court's Judgment (Docket No. 127), the period for appeal was tolled, and it remains the continuing competence, and further, the obligation, of this Court to scrutinize the validity of its own exercise of jurisdiction.[1]

## III. LIABILITY OF DEFENDANT FOURNIERS

### A. Trespass

■ Under Puerto Rican law, only the aggrieved possessor of a parcel of land, or someone with a lawful and superior right thereto, may bring an action in trespass. The Supreme Court of Puerto Rico observed, in *Iturrino v. De Jesus,* 31 P.R.R. 71, 72, 1922 WL 4721 (1922), that "in actions for trespass the plaintiffs must, at the time of the unlawful entry, be in possession of the land, and this is true because the gist of the action is an injury to the right of possession."[2] The Restatement (Second) of Torts, § 158 also defines

---

1. The Court does not, by the result of this Opinion, mean to condone in any form the manner in which Defendants the Republic of Costa Rica and its Consulate in Puerto Rico have conducted this lengthy and contentious litigation.

2. In fact, in *Iturrino,* 31 P.R.R. at 71, 1922 WL 4721, the Supreme Court of Puerto Rico went even further, and ruled that even an unauthorized and illegal possessor of a parcel of land, could bring an action in trespass against all invaders, up to and including the rightful owner.

a trespasser as someone who "intentionally enters land in the possession of another, or causes a thing or a third party to do so; or remains on the land; or fails to remove from the land a thing which he is under a duty to remove." In the instant case, Defendant Fourniers may be deemed trespassers only if, and for those times, they did not rightfully possess the disputed property. Moreover, the Puerto Rico Civil Code, 31 P.R. LAWS ANN. § 4057 clarifies that "[t]respass does not exist if the third person, whether it be the administration of a private person, has acted by virtue of a right belonging to him." *See also Central Eureka v. Fajardo,* 45 P.R.R. 627, 1933 WL 4229 (1933). The parties do not dispute that the Defendant Fourniers took possession on October 1, 1991, of the Fagots' property pursuant to a lawful lease agreement executed on September 24, 1991.

Notwithstanding, Plaintiffs argue that immediately upon locating the Consulate of Costa Rica in the premises, Defendant Fourniers (and thus, directly or indirectly, Defendants Costa Rica and Consulate) became trespassers. The Court is certainly mindful that Defendant Fourniers' actions

violated an express contractual prohibition against commercial use of the property, giving rise to an ongoing, material breach of the lease.[3] Had Defendant Fourniers occupied the property pursuant to a mere permissive, conditional license, unsupported by consideration, an action in trespass could have potentially proceeded.[4] However, that legal principle is subsumed to the contractual reallocation of property rights inherent in a real estate lease agreement.[5] The mere fact that Defendant Fourniers engaged in an ongoing violation of certain material clauses in the lease agreement did not, per se and absent affirmative action by the landlords, terminate the contract and void their right to remain in the property.[6] The Puerto Rico Civil Code Art. 4051, 31 P.R. LAWS ANN. § 4053, explicitly states that if "a lessor or lessee should not comply with the obligations mentioned in sections 4051 and 4052 [non-payment of the rent and unauthorized use] of this title, they may request the rescission of the contract and indemnity for losses and damages, or only the latter, leaving the contract in force." It is apparent from the face of the statute that termination of the lease agreement did not

---

3. The Defendants have not seriously contested the materiality of the breach, and rightfully so. Article 1556 of the Puerto Rico Civil Code, 31 P.R. LAWS ANN. § 4052, stating that "the lessee is obliged... to use the thing leased as a diligent father of family would, applying the same to the use agreed upon; and, in the absence of an agreement, to the use which may be inferred from the nature of the thing lease according to the custom of the land."

4. *See* Restatement (Second) of Torts, § 168 providing that "a conditional or restricted consent to enter land creates a privilege to do so only in so far as the condition or restriction is complied with." The development of this common law principle and incorporation into Puerto Rican jurisprudence, of course, is the competence and prerogative of the Supreme Court of Puerto Rico.

5. *See* Restatement (Second) of Torts § 171, comment *i*, observing that intentional trespass founded on breach of conditional consent "[s]hould be understood to be subject to the various ramifications of the law of real property, under which a license coupled with an interest may under some circumstances amount to a property interest in the land itself, of a kind which is irrevocable, either by the licensor or by his transferee. In such case this Section has no application."

6. This is also the general rule at common law. See Restatement (Second) of Real Property § 13.1, comment *k*, observing that a lease "[i]s not automatically terminated by the tenant's failure to perform a promise. The right to terminate given the landlord under the rule of this section is an option to terminate the lease."

occur unless and until the Plaintiffs affirmatively exercised their discretion.[7] Since Plaintiffs did not assert their right to terminate the original lease agreement until the June termination notice, the Court finds that Defendant Fourniers' did not trespass on Plaintiffs' property until July, 1993 and that such trespass continued until October, 1994, subject to the determination that a new contract was never formed.[8]

## B. Breach of Contract

■ The Court now holds that, notwithstanding its prior vacated ruling, Plaintiffs and Defendants never re-established the contractual landlord-tenant relationship following the June termination notice. The August demand letter requesting a rent increase, despite Defendant Fourniers' refusal to vacate the premises, did not form an implied contract under Puerto Rican civil law, by application of the doctrine of *tacita reconduccion* (tacit relocation) or otherwise.

Specifically, the Court now determines that the civil law doctrine of *tacita reconduccion*, or tacit relocation, does not provide any support for a contractual theory of relief. Article 1566 of the Puerto Rico Civil Code, 31 P.R. LAWS ANN. § 4063 provides that when "[o]n the expiration of the contract, the lessee continues enjoying the thing leased for fifteen days (15) with the acquiescence of the lessor; it shall be understood that there is an implied new lease for the times mentioned in Sections 4083 and 4092 of this title unless a notice has previously been given."[9] The Puerto

---

7. The Court notes that Article 1559 of the Puerto Rico Civil Code, which states that "[t]he lessee is obliged to give notice to the owner with the least possible delay of any usurpation or injurious alterations which any other person may have made or is openly preparing to make to the thing leased," does not apply to mere trespass referred to in Article 1560. The Supreme Court of Puerto Rico has held that Articles 1559 and 1560 are correlative and mutually complementary, and thus the application of one precludes the other. *Central Eureka*, 45 P.R.R. at 627, 1933 WL 4229.

8. The June termination notice effectively rescinded the lease agreement notwithstanding Defendants' waiver argument, premised on Plaintiffs acceptance of the June rent payment. *See F.D.I.C. v. Caledonia Inv. Corp.*, 862 F.2d 378 (1988) (holding that acceptance of two monthly mortgage payments after notice of intent to accelerate the mortgage did not affect mortgagee's right to accelerate payment of the entire debt, nor did it cure mortgagor's default). Moreover, Plaintiffs reaffirmed their termination of the original lease agreement in the August demand letter, as clearly evidenced by the wording of the document and by the return of uncashed checks for the July and August rent payments. The letter explicitly reiterates that "there does not currently exist a lease agreement" and demands $7,500 pursuant to the acceleration clause in the prior lease agreement. Therefore, the Court finds that the trespass commenced on July 1993.

9. The referenced Civil Code Article 1581, 31 P.R. LAWS ANN. § 4092 states that "[s]hould a term not have been fixed for the lease, it is understood for years, when an annual rent has been fixed, for months, when the rent is monthly, and for days, when it is daily. In every case the lease ceases without the necessity for a special notice upon expiration of the term." This provision, in combination with the statements in the August demand letter the increased payments were due "monthly," (see Exhibit C, Plaintiffs' Opposition to Motions to Dismiss, Docket No. 13, our translation), makes it crystal clear that any newly formed contract would have been created on a month-to-month basis. Any such contract would have expired upon the filing of the instant lawsuit on September 30, 1993. *See Cesani Vargas v. Superior Court*, 92 P.R.R. 230, 243, 1965 WL 14311 (1965) observing that "The notice of the complaint on defendant destroys the presumption that defendant continued enjoying the property as of [date] with the lessors' acquiescence." Thus, even if the Court's analysis were mistaken, and an implied contract had indeed been formed by the Fourniers' refusal to leave, the term of the contract would have only lasted a single month, September of 1993. Further, since

Rico Supreme Court has identified five conditions for the implied renewal of a lease, namely (i) existence of a contractual bond amongst the parties; (ii) expiration of prior lease; (iii) continuation of lessee's enjoyment of the thing leased for more than 15 days; (iv) acquiescence by lessor for said continuation; and (v) no prohibition in the original contract, express or implicit, that indicated that a new lease had not been foreseen. *See Cesani Vargas*, 92 P.R.R. at 230, 1965 WL 14311; *Torres v. Biaggi*, 72 P.R.R. 813, 1951 WL 7580 (1951). Applying those conditions to the facts of the case, the putative contract does not pass muster.

First, pursuant the discussion above, the original lease agreement was terminated explicitly by Plaintiffs in their June termination notice, and did not expire upon its stipulated end on September 31, 1994. *See Leon Parra v. Gerardino*, 58 P.R.R. 494, 495, 1941 WL 8405 (citing with approval Spanish civil law commentator who stated that "[w]e thus conclude that tacit relocation is not a new contract, but rather a continuance of the original, whose extinction is suspended by the implied consent of the parties, not for a new term set by mutual accord—for in that case should be treated as a new agreement—but instead for a time set by law, absent express agreement."), (translation ours).

Second, the August demand letter doubling the rental price-tag can not be reasonably characterized as acquiescence by the lessor, either in language or in content. In fact, this particular purported acquiescence arrived at Defendant Fourniers' doorstep complete with returned, uncashed checks for July and August. The Court deems the August demand letter, as previously indicated, constitutes a new offer that required some form of acceptance,

express or otherwise. *See R.F. Realty Corp. v. J. Gus Lallande, Inc.*, 87 P.R.R. 331, 359, 1963 WL 15009 (1963) (observing that if tenant wished to avoid landlord's demand for a rent increase at the expiration of lease, tenant should not have paid the revised sum, but "[r]ather, it would have been easy for her to insist that since her occupation was founded on tacit relocation, she was only obligated to satisfy the rent payments stipulated in the original contract."); *Leon Parra*, 58 P.R.R. at 494, 1941 WL 8405 (holding that when a lease contract is terminated and the tenant continues in possession with the consent of the landlord, the original contract of lease is extended under the same terms as when it was executed, except that the date of maturity is substituted by the time set by law).

Finally, the original contract expressly provided that "[i]n the event lessors wish to renew this contract they must notify lessees in writing at least 60 days in advance, and the new contract must be negotiated at least 30 days prior to expiration of the current one." While this language does not per se preclude tacit relocation, see *R.F. Realty*, 87 P.R.R. at 331, 1963 WL 15009 (holding that a landlord may waive an option clause, if he is the intended beneficiary, by accepting rent payments), it is indicative of the parties intent to pre-empt application of the doctrine. Therefore, the civil law doctrine of *tacita reconduccion* or tacit relocation did not create a new month-to-month contract upon termination of the original agreement.

Moreover, a more general theory of implied contract does not apply because the requisite elements of offer and acceptance were not present, either expressly or

---

the term of the original lease agreement expired according to its own terms on September 30, 1993, and judicial action for eviction

was pending on that date, the continued presence in the premises after such date can only be characterized as trespass.

implicitly. In order for a Court to imply constructive consent, the conduct or actions of the parties must show unequivocally the will to consent, and may not be compatible with any other will, nor subject to diverse interpretations. *Teachers Annuity v. Conjugal Partnership*, 115 P.R. Offic. Trans. 372 (1984). Valid consent in legal transactions requires the consenting party to have adequate knowledge of the consequences of such declaration of will. *Colon Gutierrez v. Registrar*, 114 P.R. Offic. Trans. 1095 (1983).

Although Plaintiffs' August demand letter may certainly be reasonably construed as an offer to Defendant Fourniers' to remain in the property conditioned on the increased $5,000 monthly rent, the Fourniers did not take any actions at any time indicating their approval of this proposed arrangement. Most tellingly, rather than remit a single $5,000 check to Plaintiffs, they stopped paying rent altogether. In light of this fact, this Court may not imply consent merely because Defendants refused to vacate the property. Defendants may have believed that Plaintiffs' demand letter was not grounded in law or fact, or that the original Lease Agreement was still valid and in force (see Defendants' letter dated July 17, 1994, Exhibit C, Plaintiffs' Opposition to Motions to Dismiss, Docket No. 13). Or quite simply, they may have chosen to wilfully disregard Plaintiffs' rights in the disputed property. The Court concludes the facts applied to the law constitute the figure of a trespass, not acceptance of a new contract.

In sum, this Court finds that, after careful review of the facts, the contractual relationship among the parties ended with the Plaintiffs' June termination notice, and that Defendant Fourniers were, at all times thereafter trespassers upon Plaintiffs' property. Defendant Fourniers would thus be liable, subject to sovereign immunity analysis, for breach of contract damages to Plaintiffs solely for the 21 month period between October 1991 and June 1993, and liable thereafter for trespass and consequential damages for the 16 month period between July 1993 and October 1994, inclusive.

## C. Property Damage and Mental Distress

■ In addition to non-payment of rent, Plaintiffs alleged in their Amended Complaint (Docket No. 69) certain physical harm to their property and damages for mental anguish and suffering. The physical damages included a dead mango tree, a splotchy lawn checkered with dead patches, an insect-infested avocado tree, a mutilated door, broken kitchen and light fixtures, worn out air conditioner casing, and most significantly, damages to a structural wall. The mental distress included "[w]itnessing the material destruction and deterioration of their own residential property, by being unable to recover its possession, and by being unable to lease it to third parties." (Docket No. 69). In the Opinion and Order dated March 31, 2000 (Docket No. 126), this Court awarded Plaintiffs $3,000 in compensation for the physical harm and $30,000 in compensation for the mental damages.

Evidently, these descriptions of damages are not additional, independent legal basis for recovery. Rather, they are simply recitals of property and mental damages that resulted from the two distinct underlying claims.[10] Pursuant to Puerto Rican civil

---

10. The general negligence statute of the Puerto Rico Civil Code, Article 1802, states that "[a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done." 31 P.R. LAWS ANN. § 5141. With respect to contractual breaches, Article 1054, a separate provision of the Puerto Rico Civil Code, states that "[t]hose who in fulfilling their obligations are guilty of fraud, negligence, or delay... shall be sub-

law and consistent with the allegations in the Amended Complaint (Docket No. 69), the Court holds that both the property damages and $10,000 of the mental damages in question are properly charged to Defendant Fourniers as the result of their contractual breach.[11] *See Diaz Irizarry v. Ennia, N.V.*, 678 F.Supp. 957 (D.P.R.1988) (observing that "generally under the substantive law of Puerto Rico, consequential damages, including for mental suffering, are available in breach of contract situations if they were foreseeable at the time the contract was formed.") The balance of the mental damages, including Plaintiffs' suffering from not being able to access their property, are more appropriately charge to Defendants' trespass. Actual imposition of damages upon any of the defendants, of course, is subject to the Courts' determination of subject matter jurisdiction.[12]

ject to indemnity for the losses and damages caused thereby." 31 P.R. LAWS ANN. § 3018. The Supreme Court of Puerto Rico has held that the two sections are mutually exclusive, observing that Article 1802 applies only when "no prior obligation exists between the person causing the damage and the one receiving it." *Arroyo v. Caldas*, 68 P.R.R. 639, 641, 1948 WL 6691 (1948) (holding that failure to keep rented premises in good repair, and corresponding injury for third party invitee, gave rise to a civil action for breach of lease agreement). *See also Stainless Steel & Metal Mfg. Corp. v. Sacal V.I.*, Inc., 452 F.Supp. 1073, 1081 (D.P.R. 1978) (stating that "[i]t is only when the obligation is not of a contractual nature, that is, only when an illicit act or omission involving fault or negligence is present that [Article 1802] is of application."); *Prieto v. Maryland Casualty Co.*, 92 P.R.R. 586, 595 (1970) (commenting that "the mere fact that in the process of breaching the contract [defendant] engaged in tortious conduct does not transform the instant cause of action into a tort subject to [certain notice prerequisites to suing municipalities]." While the standard for negligence under the two sections may be similar, the distinction is relevant "for purposes of statutes of limitations and damages, among other things"). *Pennsylvania Ship Supply Co. v. X–Press Freight Forwarders, Inc.*, 825 F.Supp. 453, 455 (D.P.R.1993).

11. In the instant case, the original lease agreement included two clauses making the maintenance and upkeep of the property a matter of contractual responsibility among the parties. Clause No. 6 (Improvements) stipulated that: "[l]essees may not make improvements upon the property or alterations without the prior written consent of the lessors; in case these are authorized the quality of work shall the same as the original, and such improvements will be the property of lessors, without any obligation of compensation to lessees" (translation ours). Meanwhile, Clause No. 7 (Reparations and Maintenance) stipulated that: "[l]essees will effect, at their own expense, any ordinary repair, *replacements or maintenance that the proper*ty may require, including the first $100 attributable to reparation of electric appliances, plumbing, painting and other ordinary repairs, without any right to offset such payments against the monthly rent. All such repairs and replacements must maintain the level of quality of what the property currently enjoys" (translation ours).

12. In drawing this distinction, the Court assumes that the property damage occurred during the time that the original lease agreement was in force—that is, between October 1991 and June 1993. Certainly, as evidenced in Plaintiffs' letter dated July 13, 1993 (Exhibit C, Opposition to Motion to Dismiss, Docket No. 13), the harm to a structural wall, which accounted for the bulk of the damages (and apparently, the source of the parties' fallout), happened during that period. The Court has no evidentiary basis to determine the exact time when the guilty termites decided to make the avocado tree their new home, when particular patches of grass passed away, or when *the offending religious medallion was ham*mered into the mutilated door. To the extent that the harm occurred after termination of the lease agreement, the corresponding damages would be grounded instead in trespass, subject to sovereign immunity analysis.

## IV. LIABILITY OF DEFENDANTS REPUBLIC OF COSTA RICA AND CONSULATE

### 1. Puerto Rican Agency Law

 Having identified the basis for liability of Defendant Fourniers, the Court now turns to the Republic of Costa Rica and the Consulate. As the Court noted in its prior vacated Opinion and Order (Docket No. 119), in cases where a party seeks compensation of damages in contract, Puerto Rico's Civil Code specifically states that "[w]hen an agent acts in his own name, the principal shall have no action against the person with whom the agent has contracted, nor the said persons against the principal. In such case, the agent is directly liable to the person with whom he has contracted, as if the transaction were his own." Laws of P.R. Ann. tit. 31, § 4426. *See also Satellite Broadcasting Cable Inc. v. Telefónica de España S.A.*, 786 F.Supp. 1089 (D.P.R.1992). Since the record clearly shows that the consuls did not enter into the original lease in Costa Rica's name (and in fact, Plaintiffs did not discover Costa Rica's presence in their property and attendant principal status until August 1994), Costa Rica and the Consulate cannot be held liable for the Fourniers' breach of contract during the 21 month period between October 1991 and June 1993,

 Notwithstanding, under Puerto Rican law, Costa Rica and the Consulate are responsible for torts committed by their agents, so long as there is a reasonable relationship between the acts of the agent and the principal's purposes, or the agent is acting for the benefit of the principals. *Torres v. National Association of Underwater Instructors*, 928 F.Supp. 134 (D.P.R.1996); *Martínez Gómez v. Chase Manhattan Bank*, 118 P.R.R. 542, 1979 WL 59124 (1979). Moreover, the Foreign Sovereign Immunities Act (FSIA) removes the sovereign immunity of a foreign state (subject to certain conditions) for the tortious activity of its employees within the scope of their employment, as governed by state law. *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591, 2598 n. 11, 77 L.Ed.2d 46 (1983). Since Defendant Fourniers' trespass was clearly within the scope of their employment and for the benefit of their principal, the Court's analysis of Costa Rica and the Consulate's liability must continue a step further.[13] Because these defendants are part of a very special class—sovereign states—they may only be subject to the jurisdiction of the federal courts in accordance with the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1605 *et seq. See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 690, 102 L.Ed.2d 818 (1989).

### 2. Foreign Sovereign Immunities Act

 Under the FSIA, foreign states and their instrumentalities are presumed immune from the jurisdiction of the Courts of the United States unless a speci-

---

**13.** Essentially, Puerto Rico's law establishes as a fundamental consideration that the employee's acts "furthered a desire to serve and benefit the employer's interest, resulting in an economic benefit to the employer." *Borrego v. United States*, 790 F.2d 5, 7 (1st Cir.1986); citing *Martínez v. Comunidad*, 90 P.R.R. 451, 1964 WL 14313 (1964) and *Llorens v. Lozada*, 73 P.R.R. 260, 1952 WL 8040 (1952). An employee will thus be found to be acting with the "scope of employment" upon an evalua-tion of the following three factors: (i) desire to serve, benefit, or further the employer's business or interest; (ii) that the act is reasonably related to the scope of employment; and (iii) that the agent has not been prompted by purely personal motives. *Id. See also Rodríguez v. United States*, 328 F.Supp. 1389, 1391 (D.P.R.1971); *Attallah v. United States*, 955 F.2d 776, 782 (1st Cir.1992); *Pérez Rodríguez v. Sauri*, 84 P.R.R. 480, 1962 WL 14889 (1962).

fied exception applies. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993). With the statute, Congress intended to codify the restrictive theory of sovereign immunity, under which a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts, but not as to those that are private or commercial in character. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). The three potentially applicable exceptions to the instant case are the tortious activity exception, 28 U.S.C. § 1605(a)(5), the commercial activity exception, 28 U.S.C. § 1605(a)(2) and the immovable property exception, 28 U.S.C. § 1605(a)(4).

## A. Tortious Activity Exception

 The tortious activity exception, codified in FSIA Section 1605(a)(5), eliminates sovereign immunity in those cases "in which money damages are sought against a foreign state for ... damage to or loss of property, occurring in the United States and caused by a tortious act or omission of that foreign state..." 28 U.S.C. § 1605(a)(5). However, subsection A of section 1605(a)(5) provides that the "tortious act" exception does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." Despite potentially inconsistent remarks in this Court's prior Opinion dated December 29, 1999 (Docket No. 129), the discretionary function safe harbor may relieve a sovereign defendant from liability for any non-commercial tort in addition to those specifically listed in subsection B (malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit or interference with contract rights). Hence, Plaintiffs' trespass claim must survive the discretionary function gauntlet.[14]

 When construing the scope of a "discretionary function" under the FSIA, Courts may turn for guidance to the case law interpreting the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2680 (1982). The FTCA contains an analogous "discretion-

---

**14.** In *Hatahley v. U.S.*, 351 U.S. 173, 76 S.Ct. 745, 100 L.Ed. 1065 (1956), the Supreme Court held that the Federal Tort Claims Act allowed suit against United States Government for unauthorized entry by federal rangers into Indian territory and subsequent appropriation of Indian horses. This case clarified that Congress added the word "wrongful" to the phrase "loss of property caused by negligent or wrongful act" in to encompass certain torts at common law that could not strictly be labeled negligent. The Court did not imply that a discretionary function analysis is unnecessary when trespass is alleged, but rather found the lack of discretion too obvious to discuss. The Court stated that it was not "[c]oncerned with any problem of a 'discretionary function' under the Act, see *Dalehite v. United States*, [citation omitted]. These acts were wrongful trespasses not involving discretion on the part of the agents, and they do give rise to a claim compensable under the Federal Tort Claims Act."

In the analog context of the Federal Tort Claims Act, *see Kruchten v. U.S.*, 914 F.2d 1106 (8th Cir.1990) (commenting that "[s]ince [the Court has] already concluded that the district court did not err in holding there is neither a duty nor a trespass under Minnesota law, [the Court] need not determine whether the action or inaction by the government here falls within the discretionary function exception."); *Green v. U.S.*, 629 F.2d 581 (9th Cir.1980) (holding that "[t]he government's decisions to apply DDT and to comply with the removal restriction by sending notice letters to livestock owners were protected by the discretionary function exception". Appellants' claims alleging trespass and noncompliance with the EPA order are therefore barred.); *Roberts v. City of Geneva*, 114 F.Supp.2d 1199 (N.D.Ala.2000) (finding that defendants were "[e]ntitled to discretionary function immunity as to Plaintiff's state law claims of trespass, conversion, conspiracy, and intentional infliction of emotional distress.")

ary function" provision, compare id. § 2680(a), with id. § 1605(a)(5)(A), that served as a model for subsection A. *See* H.R.Rep. 1487, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad. News 6604, 6620. However, the term "discretionary function" should be given "wider scope" under the FSIA, since the courts "must consider the additional risk of interfering with foreign relations." *Risk v. Kingdom of Norway*, 707 F.Supp. 1159 (N.D.Cal.1989).[15] The fact remains that "a foreign state remains largely immunized from torts committed in its governmental capacity." *Olsen by Sheldon v. Government of Mexico*, 729 F.2d 641, 645 (9th Cir.1984), *cert. denied*, 469 U.S. 917, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984). Accordingly, the Court must scrutinize the claims against foreign sovereign under the tortious activity exception through a stricter lens than it would examine claims against the United States.

In the context of the Federal Tort Claims Act, the Supreme Court defined the scope of the discretionary function provision to protect "decisions grounded in social, economic, and political policy." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). The Supreme Court also indicated that it is "the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given

case." *Id.* at 813, 104 S.Ct. at 2765. In that way, federal courts may "avoid second guessing policy decisions through the medium of a tort action." *Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018 (9th Cir.1987).

Not surprisingly, the parties in the instant case have engaged in heated debate as to the proper characterization of the instant dispute. Defendants prefer a higher level of abstraction, proclaiming that the refusal of consuls to vacate the premises implemented or executed the lofty and uniquely sovereign decision to foster, through a diplomatic mission, the cultural and economic ties between the Commonwealth of Puerto Rico and the Republic of Costa Rica. Plaintiffs would rather dig into the trenches, describing a rather colorful picture of Defendants' trespass and resulting harm as mere tardiness, cheapness, refusal to pay the bill, and acute uncleanliness. Under FSIA jurisprudence, this verbal swordplay is to no avail. Applying *Varig*, 467 U.S. at 797, 104 S.Ct. at 2755, courts have concluded that the discretionary function exception shields the government from liability, not only for those decisions which involve a measure of policy judgment, but also the *execution* of such decisions in specific instances by subordinates, (even those at the operational level) as long as they exercise such judgment too (emphasis added). *MacArthur Area Citizens Ass'n v. Republic of Peru*, 809

---

**15.** Moreover, the legislative history shows, and courts have repeatedly acknowledged, that the primary purpose of this exception is to address traffic accidents caused by employees acting within the scope of their employment with foreign nations or their instrumentalities. H.R.Rep. 1487, 94th Cong., 2d Sess., reprinted in 1976 U.S.Code Cong. & Ad.News 6604, 6620. *See Randolph v. Budget Rent–A–Car*, 97 F.3d 319 (9th Cir.1996); *Frolova v. Union of Soviet Socialist Republics*, 558 F.Supp. 358 (N.D.Ill.1983) (noting that "[t]he tort immunity exception was cast in general terms to encompass all noncommercial tortious actions for money damages but was directed primarily at problems like the traffic accidents of foreign diplomats."). *See also Joseph v. Office of Consulate General of Nigeria*, 830 F.2d 1018 (9th Cir.1987) (observing that "[t]his is scarcely to say that the exception applies only to traffic accidents, cf. *McKeel v. Islamic Republic of Iran*, [citation omitted] rather, the point is that the legislative history counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law.").

F.2d 918 (D.C.Cir.1987); *Red Lake Band of Chippewa Indians v. United States,* 800 F.2d 1187, 1196 (D.C.Cir.1986).

Evidently, the Republic of Costa Rica's decision to establish a Consulate in Puerto Rico, in this particular building in an upscale residential neighborhood, notwithstanding public or private prohibitions on commercial use, is a protected discretionary public policy decision, sovereign in nature and grounded in social, economic and political policy. *See MacArthur,* 809 F.2d at 918; *Joseph,* 830 F.2d at 1026. However, the Court must also scrutinize the refusal of the consuls to vacate the disputed property, and to continue to operate the Consulate without payment therefor, as specific "implementing" or "executing" actions underlying the relevant policy decision, subject to *Varig* analysis. This is a somewhat more complex task, and the Court turns to *MacArthur* and *Joseph* for guidance.

The *MacArthur* court found that placement of the Peruvian naval chancery in a residential area in violation of zoning laws, and implementing security and aesthetic measures that created a common law nuisance to neighbors, reflected a policy judgment to address security concerns, an economic judgment regarding property valuation, and an aesthetic judgment with respect to the political image that the Peruvian government wished to project. In fact, the *MacArthur* court deemed the discretionary and public character of the decisions resoundingly evident, and commented that they not only involved "just some 'measure' of policy judgment, but [were] at bottom a matter of precisely such judgment." *MacArthur,* 809 F.2d at 923. In contrast, the *Joseph* court found that a consular official's destruction of property, as well as the removal of valuable items, contained in a residence formally leased by the Nigerian Consulate but used for personal purposes only, did not constitute a discretionary function within the meaning of the FSIA. The Court now holds, consistent with its prior vacated rulings in this case, that the disputed trespass in the instant case is more closely analogous to the disputed nuisance and zoning violation in *MacArthur* than to the property theft and destruction in *Joseph,* and hence the tortious activity exception to sovereign immunity is inapplicable.

The choice that the consuls confronted upon receipt of Plaintiffs' June termination notice was imbued with elements of political judgment. Had they vacated the property, they would not have had a place to live, significantly impeding the performance of their official functions. Moreover, the Consulate itself would have had to move, paralyzing the Costa Rican presence in Puerto Rico and thereby negating the Costa Rican policy decision. The decision to remain in the property and operate the Consulate undoubtedly had elements in furtherance of the protected discretionary decision.

In addition, there is no evidence that Defendants were motivated purely by selfish personal or destructive considerations. Neither Costa Rica nor the consuls were likely aware of the subtleties of Puerto Rican civil law previously discussed in this opinion, as to what constituted a material breach or effective termination of a lease agreement. Following a dispute over a broken air conditioner and a late payment, the consuls attempted to continue paying the rent but the landlords returned their checks uncashed and instead issued demands for double the amount. Moreover, the consuls were confronted with a federal eviction lawsuit with what they believed was an uncertain outcome. Although good faith is neither necessary, nor sufficient in and of itself to establish sovereign immunity, an inquiry into motivation is obviously

relevant to establishing the "grounds" for a particular decision.

Finally, an evaluation of the range of alternatives available to the consuls' at the time of the June termination notice reveals that there were countervailing political and economic costs and benefits attendant to each course of action. Perhaps Costa Rica and the consuls could have moved the Consulate to a different building, increased their diplomatic relations budget, temporarily shut down the Consulate or scrapped it altogether. However, this Court cannot sit in de novo review and select a lawful alternative that would have been superior. As explicitly provided in the statute, the sovereign is protected even from an *abuse* of the discretion, § 1605(a)(5)(A) (emphasis added).

In conclusion, the decision to trespass by remaining in the property after termination of the lease agreement was not purely destructive as in *Joseph,* *ultra vires*

as in *Red Band,* motivated solely by personal considerations, unrelated to the implementation of a policy decision, or so arbitrary that it cannot be reasonably labeled as an exercise of judgment. Every immune claim under the FSIA results, by definition, from otherwise illegal conduct that is also harmful to the plaintiffs. That, alone, cannot confer jurisdiction upon this Court.[16]

### B. Commercial Activity Exception

The Court must also analyze Plaintiffs' trespass claim under the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2). The determination that a sovereign enjoys immunity from a tort claim that resulted from a protected "discretionary act" within the meaning of the statute does not preclude a finding that the sovereign can be held liable if the tort was based upon an unprotected "commercial activity."[17]

**16.** Plaintiffs made in their Motion for Reconsideration the rather puzzling argument that the execution of a consular convention between the United States and Costa Rica, signed on January 12, 1948, which stipulated that "the sending state, in accordance with such condition as may be prescribed by the laws of the receiving state" may acquire the lands and buildings necessary for the establishment of a diplomatic mission, somehow strips the Fourniers' actions of their discretionary character. Plaintiffs sweeping argument effectively means that Costa Rica, as a result of that innocuous clause, may never enjoy sovereign immunity in any claim dealing with embassy property and real estate since any claim for money damages under the FSIA would obviously be founded on a violation of the law. The Court rejects this contention.

To the extent that Plaintiffs intended to argue that Defendants acted *ultra vires* (doubtful since that would remove Costa Rica's liability as principal), that possibility is addressed elsewhere in this Opinion.

**17.** As pointed out in *El–Hadad v. United Arab Emirates,* 216 F.3d 29 (D.C.Cir.2000), "this reading is confirmed by the legislative history,

which repeatedly refers to the category encompassed by paragraph (5) as noncommercial torts." H.R.REP. NO. 94–1487, at 20, 21. *See Amerada Hess Shipping Corp.,* 488 U.S. at 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) (referring to § 1605(a)(5) as the "noncommercial torts exception"); *cf. Nelson,* 507 U.S. at 361–62, 113 S.Ct. 1471 (finding that the tortious activity alleged in that case, wrongful arrest by Saudi police, failed to qualify as commercial activity because it was "not the sort of action by which private parties can engage in commerce"). For relevant case law, *see also Gilson v. Republic of Ireland,* 682 F.2d 1022, 1028 n. 27 (D.C.Cir. 1982) (stating that 28 U.S.C. § 1605(a)(5)(B) "does not limit id. § 1605(a)(2)"); *Southway v. Central Bank of Nigeria,* 198 F.3d 1210, 1219 (10th Cir.1999); *Export Group v. Reef Industries, Inc.,* 54 F.3d 1466, 1473–77 (9th Cir.1995); *Letelier v. Republic of Chile,* 748 F.2d 790, 795 (2d Cir.1984) (noting that the statutory language "suggests that the commercial activity exception to jurisdictional immunity under paragraph (2) and the tort exception under (5) are mutually exclusive").

The first clause of § 1605(a)(2) of the Act provides that a foreign state shall not be immune from the jurisdiction of United States courts in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." The Act defines such activity as "commercial activity carried on by such state and having substantial contact with the United States," § 1603(e), and provides that a commercial activity may be "either a regular course of commercial conduct or a particular commercial transaction or act," the "commercial character of [which] shall be determined by reference to" its "nature," rather than its "purpose," § 1603(d).

■ In the FSIA, Congress intended to codify the restrictive theory of sovereign immunity, under which a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts, but not as to those that are private or commercial in character. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 487, 103 S.Ct. 1962, 76 L.Ed.2d 81 The Supreme Court explained in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612, 112 S.Ct. 2160, 2165, 119 L.Ed.2d 394 (1992) that a state engages in commercial activity under the restrictive theory where it exercises "only those powers that can also be exercised by private citizens" as distinct from those "powers peculiar to sovereigns." Put differently, a foreign state engages in commercial activity for purposes of the restrictive theory only where it acts "in the manner of a private player within" the market. *Weltover*, 504 U.S. at 614, 112 S.Ct. at 2166; *see also* Restatement (Third) of the Foreign Relations Law of the United States § 451 (1987) (observing that "under international law, a state or state instrumentality is immune from the jurisdiction of the courts of another state, except with respect to claims arising out of activities of the kind that may be carried on by private persons").

Once again, the Court must sift through the parties' feuding characterizations to identify the "gravamen of the complaint." *See Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1109 (5th Cir.1985). While Plaintiffs refers to their tenants' actions as refusal to pay, breach of a lease agreement, and deceitful cheapness, Defendants protest that they were pursuing the quintessentially sovereign goal of furthering diplomatic relations between Costa Rica and Puerto Rico. Relying on the plain text of the FSIA ("based upon commercial activity"), the Supreme Court has construed that, "in denoting conduct that forms the 'basis', or 'foundation', for a claim, [citations omitted] the phrase is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson, supra* at 349, 113 S.Ct. at 1471. *See also Millen Industries, Inc. v. Coordination Council for North American Affairs*, 855 F.2d 879, 885 (1988) (observing that "an action is based upon the elements that prove the claim, no more and no less.")

■ First, the Court must "identify those acts upon which the action is (or is not) based." *Janini v. Kuwait University*, 43 F.3d 1534, 1535 (D.C.Cir.1995). In doing so, the Court must take a stringent view of causation. In *Nelson, supra* at 357, 113 S.Ct. at 1477, the Supreme Court stated that "the only reasonable reading of the term 'based upon' calls for something more than a mere connection with, or relation to, commercial activity." Interpreting *Nelson*, the court in *Transatlantic Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.*, 204 F.3d 384 (2nd Cir.2000) concluded "that 'based upon' requires a degree of closeness between the acts giving rise to the cause of action and those needed to establish jurisdiction that is con-

siderably greater than common law causation."

Second, the Court must determine whether these constitutive elements amount to a commercial activity within the meaning of the FSIA. While this inquiry is far from analytically precise, the Supreme Court has identified certain principles crucial to the proper characterization of an activity as commercial.[18] In *Weltover, supra* at 614, 112 S.Ct. at 2166, the Supreme Court stated that "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" Although it is sometimes difficult, as the Supreme Court recognized in *Saudi Arabia v. Nelson*, 507 U.S. 349, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) "to distinguish 'purpose' (the reason why the foreign state engages in the activity) from 'nature' (the outward form of the conduct that the foreign state performs or agrees to perform)," the FSIA "unmistakably commands" us to observe the distinction. *Weltover, supra* at 617, 112 S.Ct. at 2167.

Accordingly, the Court finds that the instant claim for trespass is specifically based on the physical presence and operation of a Consulate within Plaintiffs' residential property without lawful authorization. The basis for the lawsuit is limited to the set of facts "if proven, would entitle Plaintiffs to relief under their theory of their case." *See Nelson, supra* at 356, 113 S.Ct. at 1477. Since a claim of trespass requires the intentional physical intrusion by the defendant upon the plaintiff's property, the Plaintiffs must prove in the instant case the establishment or operation of the Consulate within their property. While the preceding execution of a lease agreement and formation of a landlord-tenant relationship were undoubtedly commercial "activities [that] led to the conduct that eventually injured [Plaintiffs], they are not the basis for [the] suit." *Nelson, supra* at 358, 113 S.Ct. at 1478. Since the "only reasonable reading of the term 'based upon' calls for something more than a mere connection with, or relation to, commercial activity," *Nelson, supra* at 357, 113 S.Ct. at 1477, the fact that the trespass occurred against the context of a landlord-tenant relationship has scant, if any, relevance.

Moreover, by establishing and operating the Consulate in Plaintiffs' property, Defendants did not exercise "only those powers that can also be exercised by private citizens" but rather exercised those "powers peculiar to sovereigns." *Weltover, Inc.*, 504 U.S. at 612, 112 S.Ct. 2160. No less than a sovereign nation could have established a diplomatic mission on Plaintiffs' property. The Court notes that, given the complexities involved in discerning the nature of an act independently of its purpose, there is no logical limit (other

---

18. *See El–Hadad v. United Arab Emirates*, 216 F.3d 29 (D.C.Cir.2000) (observing that Congress "expressly concluded that it was 'unwise to attempt an excessively precise definition' of 'commercial activity,' and chose instead to give the courts 'a great deal of latitude in determining what is a commercial activity for purposes of the FSIA' providing only a few (sometimes conflicting) examples of the kinds of employment it regarded as falling within that category (citations omit-

ted))." Although the Supreme Court has repeatedly lamented this situation, *see Nelson, supra* at 359, 113 S.Ct. at 1471 (noting that the FSIA "leaves the critical term 'commercial' largely undefined"), it has also noted that courts "do not have the option to throw up [their] hands" at this "Congressional diffidence" but must instead accept "judicial responsibility to determine what a 'commercial activity' is for purposes of the Act." *Weltover, supra* at 612, 112 S.Ct. at 2160.

than semantic creativity), to the Court's ability to further parse the activities underlying the claim and thus strip them of their sovereign character. Plaintiffs' could theoretically sustain an intentional tort claim solely based upon the consuls' continued use of Plaintiffs' property *as a residence*, the kind of activity which a private person could engage in and an occasional tactic of discontent tenants. However, further deconstruction of the claim is precluded by the Supreme Court's resolution of *Nelson, supra* at 349, 113 S.Ct. at 1471. In *Nelson,* the Supreme Court held that the detention and torture of an American citizen by Saudi security officers in the context of a purely commercial undertaking, the operation did not constitute a commercial immunity because use and control over police forces is a quintessentially governmental activity. Although a private party could hypothetically (if illegally) conduct commerce through torture and abduction by hiring contract thugs, the Supreme Court in *Nelson* highlighted and relied on the fact that the torture was inflicted by

police officers. Similarly, in the instant case, although a private party could hypothetically (if illegally) conduct commerce through trespass or illegal appropriation, this Court cannot ignore the fact that the offending intruders were a consular mission and their fully accredited diplomatic officers, exercising their diplomatic discretion in their official capacity.[19] Such was the "outward form of the conduct that the foreign sovereign performs." *Weltover, supra* at 617, 112 S.Ct. at 2167.

Moreover, intentional trespass and conversion of property do not fall within "the type of actions by which a private party engages in trade or commerce." *Weltover, supra* at 614, 112 S.Ct. at 2165. Although a private disgruntled tenant could ignore a duly issued eviction notice, he would do so illegally, and would be confronted by the state's law enforcement authorities. Trespass—along with such intentional torts as appropriation of property, false imprisonment, assault, and abduction—is neither a tool of commerce, and nor "an act typically performed by

---

19. Even if the Court were to construe the character of the activity giving rise to the claim as "mixed" commercial and sovereign, it would make no difference. The Supreme Court sidestepped that legal question, observing that it did not "mean to suggest that the first clause of § 1605(a)(2) necessarily requires that each and every element of a claim be commercial activity by a foreign state, and [the Court therefore did not] address the case where a claim consists of both commercial and sovereign elements." *Nelson,* 507 U.S. at 358, 113 S.Ct. 1471. However, in *Cicippio v. Islamic Republic of Iran,* 30 F.3d 164 (D.C.Cir.1994) the court analyzed certain intentional torts based upon the abduction by Islamic Republic of Iran's of the plaintiffs in order to secure the release of Iranian assets frozen by the United States. The court found that they could not "say that the alleged tortious conduct rests entirely upon activities sovereign in character, because the kidnappers are not alleged to have been officials of the Iranian government." In this "mixed" situation, the court held that consideration of

context, as opposed to purpose, was appropriate, stating that "unless an act takes place in a commercial context it would be impossible to determine whether it is conducted in the manner of a private player in the market." *Id.* After such consideration, the *Cicippio* court concluded that hostage-taking for diplomatic leverage or profit did not constitute the type of activity by which a private person participates in the marketplace.

Even applying such "context" analysis, this Court would consider, not just the preceding landlord-tenant relationship, but also the official status of the trespassing diplomats and the broader context of the Costa Rican diplomatic efforts in Puerto Rico. Given the plain meaning of the statutory language, to characterize the consuls' unauthorized occupation as "commercial" seems like fitting a square peg into a round hole. "As with any statutory term, the commercial activity requirement must be given a logical and reasonable interpretation." *De Letelier v. Republic of Chile,* 748 F.2d 790, 797 (2nd Cir.1984).

private players in the marketplace." *Cicippio*, 30 F.3d at 168. *See Moses v. Air Afrique*, 2000 WL 306853 (E.D.N.Y. Mar 21, 2000) (holding that sovereign immunity did not apply because "the commercial activities of [plaintiff] Air Afrique—the sale of airline tickets and the provision of air travel—are irrelevant to the proof of the alleged intentional torts, including false imprisonment and wrongful conversion"); *Marketic v. Kaliber Talent Consultants, Inc.*, 1998 WL 1147140 (C.D.Cal. Mar 15, 1998) (finding that operation of an "entertainment and social services" ring by a government official, for profit and through private agents, did not constitute commercial activity within the meaning of the statute because "[t]he detention and abusive conduct complained of in this matter are not typical actions taken by participants in the marketplace"); *Aguasviva v. Iberia Lineas Aereas de Espana*, 937 F.Supp. 141, 143 (D.P.R.1996) (stating that "[t]he purchase of [plaintiffs] airline ticket and the possible breach of the airline's contract with her is not the basis for Plaintiff's negligence claim... [plaintiff's] claims of false imprisonment, false arrest, defamation, assault, and negligence arising out of these allegations of the abuse of police powers are not permissible."). While intentional trespass certainly does not require the level of malice of certain of the other intentional torts in these cases, the Republic of Costa Rica and the Consulate certainly did not act "in the manner of a private player in the market." *Weltover, supra* at 614, 112 S.Ct. at 2165.[20] Compare with *City of Englewood v. Socialist People's Libyan Arab Jamahiriya*, 773 F.2d 31, 37 (3rd Cir.1985) (holding that the Lybian consulate was immune from imposition of a tax lien, and adding that "[b]ecause the [consular] residence is not used for a commercial activity, and because the dispute does not center on the acquisition of the property, neither the section 1605 exception to immunity from personal jurisdiction, nor the section 1610 exception to immunity from execution apply.")

Finally, the Court notes that the determination reached herein is consistent with the Court's prior vacated ruling on this matter, which found the commercial activity exception applicable. That opinion relied on Plaintiff's implied breach of contract claim, which some courts have found conclusive in determining subject matter jurisdiction. In *MCI Telecommunications Corp. v. Alhadhood*, 82 F.3d 658 (5th Cir. 1996), the Court held, applying *Nelson*, that promises allegedly made by diplomats representing the United Arab Emirates to pay for illegal phone calls by its military trainees did not constitute commercial activity within the meaning of the statute. The court observed that while "private parties may engage in talks, negotiations, and may even make promises to resolve disputes, [not] all such activity will be deemed commercial." *Id.* at 663. In addition, the Court rejected the contention that since private parties can procure telephone services on daily basis, "the nature of the calls, which are stolen, could not be found to be commercial." *Id.* at 664.[21] Compare

---

**20.** *See also Nazarian v. Compagnie Nationale Air France*, 989 F.Supp. 504, 508–09 (S.D.N.Y.1998) (dismissing claims of false imprisonment, false arrest, and intentional infliction of emotional distress); *Seisay v. Compagnie Nationale Air France*, No. 95–CV–7660, 1997 WL 431084, at *5–*6 (S.D.N.Y. July 30, 1997) (dismissing false imprisonment claim).

**21.** *See also Federal Ins. Co. v. Richard I. Rubin & Co., Inc.*, 12 F.3d 1270, 1289 (3rd Cir.1993) (noting that the "claims are primarily tort claims—allegations phrased in terms of negligence, gross negligence, recklessness, nuisance, and strict liability... [t]hese claims are not 'based upon' [defendant's] sole commercial activity of forming two Dutch subsidiary corporations that eventually invested in One Meridian Plaza through a U.S. subsidiary... [s]uch activity is irrelevant to the tort claims because it does not form any 'basis' or 'foundation' of the claims." Similarly, the

with *Adler v. Federal Republic of Nigeria,* 219 F.3d 869 (9th Cir.2000), where the Court found that an illegal scheme to convert funds hatched by Plaintiffs and the Nigerian Government constituted commercial activity, since "what [drove the Court's] decision in this case, [was] the district court's finding that Adler and the Nigerian officials made a contract for illegal activity." *Id.* at 875. In the case at bar, the Plaintiffs Fagots, like the plaintiffs in *Nelson* and *Alhadhood,* "have not, after all, alleged breach of contract, [internal citation omitted], but personal injuries caused by petitioners' intentional wrongs... Those torts, and not the arguably commercial activities that preceded their commission, form the basis for the Plaintiffs' suit." *Nelson, supra* at 358, 113 S.Ct. at 1478.[22]

Accordingly, the Court holds that the commercial activity exception sovereign immunity under the FSIA does not apply to Plaintiffs' claims against the Republic of Costa Rican and its Consulate in Puerto Rico.

Court must consider the Fagots' tort claims independently of the previously terminated lease agreement).

22. *See also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,* 115 F.3d 1020, 1030 (D.C.Cir.1997) (observing that "in [prior case], the plaintiffs were medical service providers suing a foreign government for breach of contract for its failure to pay for services [citation omitted]. [Current plaintiffs], by contrast, are suing [current defendants] for actions that are uniquely sovereign in nature and that were taken in their official capacities. The [plaintiffs] entered no contractual relationship with [defendants]. Rather, the two officials fulfilled [the government's] obligations to the [plaintiffs] by performing their official tasks as administrators of a government program to provide for the health and welfare of Abu Dhabi's citizens and residents. [Defendants'] actions are not those by which a private party engages in 'trade and traffic or commerce,' and the fact that these actions may relate in certain respects to commercial

## C. Immovable Property Exception

 Plaintiffs also contend that their causes of action against Costa Rica and the Consulate fall within the exception to foreign sovereign immunity for "any case in which ... rights in immovable property situated in the United States are in issue." 28 U.S.C. § 1605(a)(4). Despite ambiguous statements in the FSIA's legislative history,[23] precedent clearly denotes that, where the right to actual possession or title is not at stake, compensation rights "are not remotely 'rights in immovable property' within the meaning of § 1605(a)(4). They are not property interests in real estate, such as a leasehold, easement or servitude, nor possessory rights, nor even rights to payment of money secured by an interest in land. Neither the title to, nor the use of the [disputed lands] can conceivably be affected by the outcome of this suit." *Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517 (D.C.Cir.1984). Since Defendants have never questioned the Fourniers' right to title in the property, and do

activity does not provide a basis for jurisdiction.")

23. The legislative history states that "[a] foreign state cannot deny to the local state the right to adjudicate questions of ownership, rent, servitudes, and similar matters ...." H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, 20–21; 1976 U.S.Code Cong. & Ad.News 6619. Notwithstanding, the Courts have universally construed the reference to 'rents' to apply to actions over proceeds of the property also involving disputes as to possession or title. *See also MacArthur,* 809 F.2d at 921 (commenting that the practice is to decline "to extend the immunity of a foreign sovereign to 'an action to obtain possession of or establish a property interest in immovable property located in the territory of the state exercising jurisdiction.'"), quoting Restatement (Second) of Foreign Relations Law of the United States § 68(b) (1965); *City of Englewood,* 773 F.2d at 37 (stating that "this is not a dispute over title to the premises, so section 1610(a)(4)(B) does not apply.")

not remain in possession thereof, the Court finds that the immovable property exception to sovereign immunity is also inapplicable to the instant dispute.

## V. CONCLUSION

 In accordance with the preceding FSIA analysis, in the absence of an applicable exception to sovereign immunity, the Court lacks subject matter jurisdiction against Defendants Republic of Costa Rica and Consulate for Plaintiffs' trespass claim.

 Moreover, individuals that commit acts within their official capacities are considered agencies or instrumentalities of a foreign state. *Jungquist,* 115 F.3d at 1020, 1027 (D.C.Cir.1997); *El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 671 (D.C.Cir.1996). The scope of sovereign immunity for a foreign state extends to any political subdivisions, instrumentalities, and agencies of that state, *McKesson Corp. v. Islamic Republic of Iran,* 52 F.3d 346, 351 (D.C.Cir.1995), *Ortega Trujillo v. Banco Cent. del Ecuador,* 17 F.Supp.2d 1340 (S.D.Fla.1998) (observing that "[t]he rationale for this [immunity] is self-evident: the protections of the FSIA would be severely impeded if individuals were subject to suit for actions taken in their capacity as the agents of foreign sovereigns.")

 Since Defendants Fourniers' disputed actions were official in nature, as recognized by the Court and argued by Plaintiffs themselves, their personal monetary gain from their rent-free stint at Plaintiffs property is irrelevant. Additional underlying personal motivations to a defendant's official actions do not strip such actions of their official character. *See Chuidian v. Philippine Nat. Bank,* 912 F.2d 1095, 1107 (9th Cir.1990). While sovereign immunity similarly will not shield an official who acts beyond the scope of his authority, *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 689, 69 S.Ct. 1457, 1461, 93 L.Ed. 1628 (1949), the evidence unequivocally shows that the Republic of Costa Rica continued to operate the Consulate in Plaintiffs property, for a year-long period following the original filing of the instant lawsuit (and prior to the filing of the amended complaint). That hardly supports Plaintiffs' conclusion that the Fourniers acted ultra vires. *See Chuidian,* 912 F.2d at 1107 (stating that "[t]he most [plaintiff] can allege is that [defendant] experienced a convergence between his personal interest and his official duty and authority. Such a circumstance does not serve to make his action any less an action of his sovereign.") Though Plaintiffs' lack of remedy against the Fourniers, like many other outcomes in FSIA jurisprudence, hardly seems fair, the Court deals here with jurisdiction, not equity.[24]

 Accordingly, the Court only has jurisdiction against the Defendant Fourniers, in their individual capacity, for Plaintiffs' breach of contract claim. For a breach of contract claim, the measure of damages is governed by two provisions of the Civil Code of Puerto Rico: Article

---

**24.** Citing *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1105–06 (S.D.N.Y.1982), the court in *Hercaire Int'l Inc. v. Argentina,* 642 F.Supp. 126, 128 (S.D.Fla.1986) noted that the FSIA "has been called a 'remarkably obtuse' document, a 'statutory labyrinth' that, owing to the numerous interpretive questions engendered by its bizarre structure and its many deliberately vague provisions, has during its brief lifetime been a financial boon for the private bar but a constant bane of the federal judiciary." After seven years of bitter litigation, the Court finally rests comfortable that it has applied the statute, with scant cooperation from the parties, faithfully and thoroughly. The Court will not entertain any further motions for reconsideration by plaintiff.

1054, 31 P.R. LAWS ANN. § 4053, *supra*, and Article 1446, 32 P.R. LAWS ANN. § 3018, which mandates that "[t]hose who in fulfilling their obligations are guilty fraud, negligence, or deal, and those who in any manner whatsoever act in contravention of the stipulation of the same, shall be subject to indemnify for the losses and damages caused thereby." The statutory purpose for damages when the lessee materially breaches a lease agreement is to compensate lessor for actual losses, not to penalize. *See Importers Center, Inc. v. Newell Companies, Inc.*, 758 F.2d 17 (1985). In order for an action for damages caused by non-performance of contract to prosper, it is not sufficient that the plaintiff establish the nonfulfillment of the obligation, but it is also necessary that he establish the real and positive existence of the damages caused, since otherwise the compensation would lose its natural character, and acquire that of a penal sanction. *Perez v. Sampedro*, 86 P.R.R. 498, 1962 WL 14709 (1962).

Pursuant to an evidentiary hearing held on March 31, 2000 (see Minutes of Proceedings, Docket No. 125), the Court had already quantified Plaintiffs' breach of contract damages preceding the June termination notice at $2,500 per month (see vacated Opinion and Order issued March 31, 2000, Docket No. 126), which would result in a total award of $52,500 for the 21 month period between October 1991 and June 1994.[25] To that amount, the Court must add $7,500 from the contract acceleration clause triggered by the June termination notice, and subtract $2,500 due from the security deposit which the Court received no evidence of return by the Fagots. Moreover, the Court includes $3,000 in property damages and $10,000 in mental damages that the Court previously determines foreseeably resulted from the contractual breach, *see Pereira v. I.B.E.C.*, 95 P.R.R. 28, 1967 WL 17142 (1967). Accordingly, the Court, in a separate order, enters judgment for $70,500 for breach of contract against co-Defendants Hilda Fournier Alpiza and Antonio Greco Fournier, plus $24,111 in attorney fees. However, all claims against Defendants Costa Rica and the Consulate in Puerto Rico must be hereby **DISMISSED** for lack of subject matter jurisdiction and the Judgment entered on March 31, 2000 must be hereby **VACATED.** The trespass claims

---

**25.** Defendants raised a number of new issues in their responsive filings, specifically that (i) Plaintiffs did not sufficiently prove damages because the rental property in question, due to zoning regulations, could not have been re-rented to a commercial tenant, and (ii) $5000 is a speculative and unsupported monthly figure for contractual damages. These arguments are not properly before the Court, since the jurisdictional 10–day period prescribed by Federal Rule of Civil Procedure 59(e) for alteration or amendment of judgment has expired. The Court has only considered said averments to the limited point that they respond to issues raised by Plaintiffs in their Motion for Reconsideration or by the Court in its analysis of sovereign immunity and subject matter jurisdiction. *See Moore's Federal Practice*, § 59.31[4] (3rd Ed.) (observing that "[a]n untimely Rule 59(e) motion cannot be salvaged on the grounds that the opposing party filed a timely motion."). Even if Defendants had filed a timely motion for reconsideration, this Court is not obligated to consider newly raised arguments. *See Jorge Rivera Surillo*, 37 F.3d at 29, stating that "a motion under Rule 59(e) is not appropriately used to present new issues or evidence": Rule 59(e) motions are aimed at reconsideration, not initial consideration. Thus, parties should not use them to raise arguments which could, and should, have been made before judgment issued.; *National Metal Finishing Co., Inc. v. BarclaysAmerican/Commercial, Inc.*, 899 F.2d 119 (1st Cir.1990); *cf. Krock v. Electric Motor & Repair Co.*, 327 F.2d 213 (1st Cir.1964) (observing that, in the context of appellate review, "[d]efendant had ample opportunities to make his damage point, but failed to take any. Whether it be termed second guessing, or an afterthought, his point is now too late.").

against Defendant Fourniers are also hereby **DISMISSED.**

IT IS SO ORDERED.