# United States Court of Appeals
## For the First Circuit

No. 01-1713

GABRIEL FAGOT RODRIGUEZ, ET AL.,

Plaintiffs, Appellants,

v.

THE REPUBLIC OF COSTA RICA, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lipez, Circuit Judge.

José G. Fagot-Díaz, with whom Fagot & Castal was on brief, for appellants.

Verónica Ferraiuoli-Hornedo, with whom McConnell Valdés was on brief, for appellees.

July 15, 2002

**LIPEZ**, **Circuit Judge**.  This case raises several questions of first impression for this circuit regarding the scope of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602-1611.  The FSIA provides the exclusive basis for acquiring subject matter jurisdiction over foreign states and their agencies and instrumentalities.  Id. §§ 1330, 1604. Under the statute, "a foreign state shall be immune from the jurisdiction of the courts of the United States," id. § 1604, unless the case falls within one of the exceptions to immunity set out in § 1605.  At issue here are the exceptions for actions arising out of a foreign state's commercial or tortious activity, id. §§ 1605(a)(2) & (5), or involving rights in immovable property, id. § 1605(a)(4).  The district court concluded that none of the exceptions applied.  We affirm.

**I.**

The relevant facts are not disputed.  Appellants, Gabriel Fagot Rodriguez and Angeles Diaz Rivera ("the Fagots"), own a house and surrounding property in San Juan, Puerto Rico.  In September, 1991, the Fagots agreed to lease the property to Hilda Fournier and Angelo Greco Fournier ("the Fourniers") for two years, at a rate of $2,500 per month.  Although the Fourniers were then the Consul and Vice-Consul of the Republic of Costa Rica, they signed the lease in their individual capacities.  The lease agreement provided that the Fourniers were to use the property for residential purposes only and prohibited them from subleasing to third parties without the Fagots' prior written consent.

Notwithstanding the restrictions in the lease agreement, the Fourniers began to operate the Costa Rican Consulate ("the Consulate") from the property. The Fagots were unaware of their actions, however, and the Fourniers remained on the property without conflict for most of the two-year lease term. The trouble began in June of 1993, when -- following a dispute over an air conditioner -- the Fourniers failed to pay the monthly rent. On June 16, 1993, the Fagots notified the Fourniers by letter that the lease was terminated effective immediately, and that the Fourniers had to vacate the premises by July 16, 1993. The Fagots also demanded that the Fourniers pay them $10,000 -- the total rent due for the balance of the lease term.[1]

Two months passed, and the Fourniers neither vacated the property, nor paid the requested amount. On August 19, 1993, the Fagots sent another letter informing the Fourniers that "since a lease contract no longer exists that stipulates the rent to be paid for the use and enjoyment of the property, you will pay monthly, retroactively to July 16, 1993, the sum of $5,000.00, that is from the date you should have vacated the property." The letter specified that the new $5,000 rental charge was to be paid "for the months of July, August and September 1993."

Some time after mailing the August demand letter, the Fagots learned that the Fourniers had been operating the Consulate

---

[1] The lease agreement provided that, "[i]f the LESSEES [do] not pay any monthly lease payment on the date the same is due, then the lease contract will be considered to be totally due and the LESSORS have the right to collect from the LESSEES the rent for the duration of the contract."

from the property.[2]  On September 30, 1993 -- the last day of the original lease term -- they filed suit against the Fourniers, the Consulate, and the Republic of Costa Rica ("Costa Rica"), alleging breach of contract, personal injury, and damage to or loss of property.  The complaint sought eviction as well as monetary damages.

The parties quickly filed a flurry of motions.  The Fagots sought immediate eviction.  Costa Rica and the Consulate rejoined with claims of sovereign immunity and inadequate service.  In the meantime, the Fourniers and the Consulate remained on the property, still without paying rent.  They finally vacated the property in October of 1994, 16 months after the Fagots terminated the lease.

In December of 1994, Costa Rica and the Consulate moved for summary judgment on the ground that they were immune from suit under the FSIA.  The Fagots responded that the case fell into the exceptions to immunity for actions involving rights in immovable property, or arising out of commercial or tortious activity by a foreign state.  The district court initially concluded that none of those exceptions applied and entered summary judgment for Costa Rica.  Fagot Rodriguez v. Republic of Costa Rica, 934 F. Supp. 493

_____

[2] It is unclear from the record when, exactly, the Fagots learned that the Consulate was located on the property.  However, in a memorandum supporting their motion for summary judgment, the Fagots represented that the August letter "was specifically addressed to the Fourniers" because "at that particular point in time (August 1993), the Fagots were unaware that Costa Rica and the Consulate occupied the Property."  Accordingly, we view it as settled that the Fagots were unaware of the Consulate's presence when they mailed the August demand letter.

-4-

(D.P.R. 1996) (Fagot Rodriguez I).[3]  The Fagots moved for reconsideration and for additional discovery.  The court granted their requests and vacated its judgment.  Eventually, the Fagots filed their own motion for summary judgment on the question of jurisdiction under the FSIA.  This time, the court determined that the case could proceed under the commercial activity and tortious activity exceptions.  Fagot Rodriguez v. Republic of Costa Rica, 99 F. Supp. 2d 157 (D.P.R. 1999) (Fagot Rodriguez II).  After holding a hearing on the question of damages, it entered an order holding Costa Rica and the Consulate jointly liable with the Fourniers for non-payment of rent between August, 1993 and October, 1994.  The court concluded that the Fourniers -- but not Costa Rica and the Consulate -- also were liable for rent due prior to August, 1993, and for property damage and mental distress.  Fagot Rodriguez v. Republic of Costa Rica, 99 F. Supp. 2d 170 (D.P.R. 1999) (Fagot Rodriguez III).  The Fagots again moved for reconsideration, arguing that Costa Rica and the Consulate were jointly liable for all damages.  Again, the district court agreed to reconsider its judgment.  However, instead of holding Costa Rica and the Consulate liable for more damages, it reverted to its earlier view that none of the exceptions provided a basis for jurisdiction under the FSIA, and dismissed the claims against Costa Rica and the Consulate. Fagot Rodriguez v. Republic of Costa Rica, 139 F. Supp. 2d 173 (D.P.R. 2001) (Fagot Rodriguez IV).  This appeal followed.

---

[3] At the same time, the court entered a default judgment against the Fourniers.  That judgment has not been appealed.

## II.

We review de novo the district court's conclusion that it lacked jurisdiction under the FSIA. See Honduras Aircraft Registry, Ltd. v. Gov't of Honduras, 129 F.3d 543, 546 (11th Cir. 1997) (conducting de novo review of FSIA jurisdictional question); Export Group v. Reef Indus., Inc., 54 F.3d 1466, 1469 (9th Cir. 1995) ("[T]he existence of subject matter jurisdiction under the FSIA is a question of law subject to de novo review."); cf. Irving v. United States, 162 F.3d 154, 162 (1st Cir. 1998) (en banc) (applying "plenary review" to the question of jurisdiction over the United States government under the Federal Tort Claims Act). As noted, the Fagots assert several bases for jurisdiction. First, they argue that Costa Rica[4] can be held liable for non-payment of rent under the commercial activity exception, 28 U.S.C. § 1605(a)(2), based on an implied lease contract created by the August, 1993, demand letter. Second, they maintain that Costa Rica's use of the property amounted to a trespass, thus supporting jurisdiction under the tortious activity exception, id. § 1605(a)(5). Finally, the Fagots argue that they can recover for nonpayment of rent (or, in the alternative, damages for trespass) under the exception for actions involving "rights in immovable property," id., § 1605(a)(4). We address those claims in turn.

---

[4] For ease of reference, we omit any further mention of the Consulate in its role as defendant.

**A.        Commercial Activity**

Under § 1605(a)(2), a foreign state is subject to jurisdiction in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." The term "commercial activity" encompasses both "a regular course of commercial conduct" and "a particular commercial transaction or act." Id. § 1603(d). In assessing whether a certain transaction or course of conduct is commercial in character, courts must look to the "nature" of the activity rather than its "purpose." Id. Thus,

> the question is not whether the foreign government [was] acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state perform[ed] (whatever the motive behind them) [were] the type of actions by which a private party engages in "trade and traffic or commerce."

Rep. of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992).

In order to qualify for the commercial activity exception, an action must be "based upon" commercial activity by the defendant foreign state. 28 U.S.C. § 1605(a)(2). The Supreme Court has explained that a claim is "based" on "those elements . . . that, if proven, would entitle [the] plaintiff to relief under his theory of the case." Saudi Arabia v. Nelson, 507 U.S. 349, 357 (1993). Here, the Fagots seek damages for, inter alia, breach of contract. There is no dispute that contract formation is an essential element of that claim, and that entering into a contract for lease of property constitutes "commercial

-7-

activity." See, e.g., Joseph v. Office of the Consulate General of Nigeria, 830 F.2d 1018, 1024 (9th Cir. 1987); see also Walter Fuller Aircraft Sales, Inc. v. Rep. of the Philippines, 965 F.2d 1375, 1386 (5th Cir. 1992) (noting the commercial nature of the making or breaching of a contract); Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Rep., 877 F.2d 574, 578 (7th Cir. 1989) (noting that "contracts for the purchase or sale of goods or services are presumptively 'commercial activities'"). The important question is whether Costa Rica in fact contracted with the Fagots for use of the property.

In the district court, the parties argued extensively over whether Costa Rica was bound by the original lease agreement between the Fourniers and the Fagots. The Fagots insisted that, although the Fourniers signed the lease in their individual capacities, Costa Rica could be held liable under agency principles. They do not press that claim on appeal.[5] Instead, the Fagots argue that the events in the summer of 1993 gave rise to an implied lease contract between themselves and Costa Rica.

_____

[5] Puerto Rico's Civil Code states:
When an agent acts in his own name the principal shall have no action against the person with whom the agent has contracted, nor the said persons against the principal. In such case, the agent is directly liable to the person with whom he has contracted, as if the transaction were his own.
Laws of P.R. Ann. tit. 31, § 4429. Relying on that provision, the district could held that Costa Rica was not liable for the Fourniers' breach of the original lease agreement, since they signed that contract "in [their] own name[s]," id., rather than as agents of Costa Rica. See Fagot Rodriguez IV, 139 F. Supp. 2d at 186.

-8-

The Fagots offer two versions of an implied contract theory. On the first theory, the August, 1993, demand letter -- stating that, in the absence of a lease agreement, the Fourniers would be charged $5,000 for each month they remained on the property -- constituted an offer for a month-to-month lease, at a rate of $5,000. By remaining on the property, the argument goes, Costa Rica accepted the offer and created a contract implied in fact.

The Fagots recognize that an implied-in-fact contract requires a "mutual intent to contract." Nevertheless, they have not even attempted to show such mutual intent here. To begin with, the Fagots have not argued -- much less established -- that they intended to enter into a month-to-month lease agreement with Costa Rica. The August demand letter was addressed to the Fourniers, not Costa Rica. In the course of the proceedings before the district court, the Fagots explained that "at that particular point in time (August, 1993), the Fagots were unaware that Costa Rica and the Consulate occupied the property." They argued that "[s]uch lack of knowledge should not operate against them." That generalization is not helpful. On the issue of an implied-in-fact contract, the Fagots' lack of knowledge about the involvement of Costa Rica undermines their claim that the demand letter was an offer <u>to Costa Rica</u>.

Moreover, whatever the Fagots' intent, there is no suggestion in the record that Costa Rica agreed to pay the Fagots $5,000 per month for its use of the property. Thus, even if we

treat the Fagots' demand letter as an offer to Costa Rica, there is no evidence that Costa Rica accepted it. Given the absence of any evidence showing a mutual intent to contract, we conclude that Costa Rica did not enter into an implied-in-fact lease for the property.

The Fagots' second theory posits a contract implied in law, or "quasi contract."[6] They point out correctly that a quasi contract does not depend on the consent of the parties but is "implied in law to prevent unjust enrichment of one party at the expense of another." However, the Fagots have made no effort to apply the general principles of quasi contract to the facts of this case. Their sole authority is International General Electric v. Concrete Builders of Puerto Rico, Inc., 104 P.R.R. 1221 (1976), in which the Puerto Rico Supreme Court found a contract implied in law where the plaintiff reasonably relied on the defendant's assurance that it would pay for certain services. The court noted that it was immaterial that the defendant did not actually intend to pay for the services; it was enough that "the terms of [the defendant's correspondence] were worthy of the trust of the [plaintiff] which had no reason to doubt of the good faith of the representation it was given." Id. at 1228-29. Thus, the court concluded, because the defendant "caused a legal situation upon which [plaintiff] relied, it cannot assume now a conduct contradictory to the one

---

[6] The Fagots' claim of an implied-in-law contract was poorly developed both before the district court and on appeal. Not surprisingly, therefore, the district court did not mention that claim in any of its four published opinions in this case.

-10-

which gained [plaintiff's] trust." Id. at 1229 (citations omitted).

Notwithstanding their reliance on Concrete Builders, the Fagots did not attempt to show before the district court that Costa Rica's conduct reasonably led them to believe that $5,000 in rent per month would be forthcoming, such that Costa Rica should be estopped from resisting such payment. See id. at 1231 (explaining that the defendant's behavior must "be the basis of the trust of [the plaintiff who] has acted in good faith and . . . in a manner which would cause him prejudice if his trust was defrauded"). The Fagots' only interaction with Costa Rica was through its agents, the Fourniers, who refused to pay any rent after the dispute over the air conditioner in June of 1993, and who stubbornly ignored the Fagots' repeated requests that they vacate the property. Such actions would not reasonably inspire trust.

Moreover, the Fagots' own conduct in the summer of 1993 belies any suggestion of detrimental reliance. The Fagots instructed the Fourniers to vacate the property by July 16, 1993. When the Fourniers did not comply, the Fagots mailed them a letter demanding $5,000 for every month they remained on the property without a lease agreement. The Fagots then learned that the Fourniers had been operating the Consulate from the property. Roughly one month later, they filed suit against Costa Rica, the Consulate, and the Fourniers, alleging that the lease agreement was terminated in June of 1993, and that the defendants had since been

in "adverse possession."  Their complaint sought, among other things, to evict the defendants from the property.

Given the Fagots' repeated attempts to terminate their relationship with Costa Rica and the Fourniers, they cannot now be heard to argue that they were lulled into inaction by Costa Rica's purported willingness to compensate them fully for its use of the property.  Accordingly, we conclude that there was no implied-in-law contract between Costa Rica and the Fagots under the principles described in Concrete Builders.

**B.          Tortious Activity**

We turn, then, to the tortious activity exception to foreign sovereign immunity.  Section 1605(a)(5) removes sovereign immunity for actions in which

> money damages are sought against a foreign state for . . . damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

That exception extends only to non-discretionary torts; it does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused."  28 U.S.C. § 1605(a)(5)(A).

Here, the Fagots seek damages for tortious trespass.  They argue, first, that both Costa Rica and the Fourniers were trespassing at least from July of 1993 -- the date by which they had been instructed to leave -- until they vacated the property in October of 1994.  Second, they maintain that Costa Rica was

-12-

trespassing on the property from the beginning of the lease period in September, 1991.  In support of that more expansive claim, the Fagots argue that the lease agreement prohibited the Fourniers from subletting the property or using it for non-residential purposes; that the Consulate is a separate legal entity from the Fourniers; and, therefore, that Costa Rica (through the Consulate) was trespassing on the property even when the Fourniers were not.

We assume, without deciding, that the Fagots have stated a claim for tortious trespass for the entire period of tenancy -- that is, from September of 1991 until October of 1994.  We further assume that the Fourniers were acting within the scope of their employment when they committed the alleged trespass.  See 28 U.S.C. § 1605(a)(5).  We need not dwell on such questions because we conclude that the Fagots' trespass claims are "based upon the exercise or performance . . . [of] a discretionary function," id. § 1605(a)(5)(A), and therefore are outside the scope of § 1605(a)(5).

The so-called "discretionary function" limitation set out in § 1605(a)(5)(A) of the FSIA is modeled on a similar exception to jurisdiction under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a).  See H.R. Rep. No. 94-1487, at 21 (1976), reprinted in 1976 U.S.S.C.A.N. 6604, 6620 (hereafter "House Report").  The latter statute has received extensive judicial treatment, and decisions construing its discretionary function exception are useful in applying the parallel provision in the FSIA.  The Supreme Court has crafted a two-part test for determining whether a

challenged government action is protected as "discretionary" under the FTCA. The first question is whether the conduct in question "is a matter of choice for the acting employee." Berkovitz v. United States, 486 U.S. 531, 536 (1988). If a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow," then there is no room for choice and the discretionary function exception does not apply. Id.

Second, assuming that the challenged conduct "involves an element of judgment," that judgment must be "of the kind that the discretionary function exception was designed to shield." Id. The purpose of the exception is to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984). Thus, it "protects only governmental actions and decisions based on considerations of public policy." Berkovitz, 486 U.S. at 537 (citing Dalehite v. United States, 346 U.S. 15, 36 (1953) ("Where there is room for policy judgment and decision there is discretion.")).

With respect to the first prong of the test, the Fagots do not dispute that the Fourniers had authority to set up a consulate in Puerto Rico, and that, generally speaking, that task involved an element of choice or judgment. However, they maintain that the particular choices the Fourniers made -- namely, to install the Consulate on the property in violation of the terms of the lease agreement, and to remain on the property without paying

-14-

rent after the lease was terminated -- were impermissible ones.  In other words, although the Fourniers' authority was essentially discretionary, they acted outside that authority when they set up the Consulate in violation of Puerto Rico landlord-tenant and trespass law.

The Fagots' primary support for that argument is a 1948 treaty between the United States and Costa Rica, which provides that either country may establish consulates in the other, and may buy or lease land for that purpose "in accordance with such conditions as may be prescribed by the laws of the receiving state."  Consular Convention, Jan. 12, 1948, U.S.-Costa Rica, art. V, para. 1, 1 U.S.T. 247.  The Fagots argue that "it is axiomatic that the laws of Puerto Rico and the United States, as the receiving state, require the landowners' consent for the use of property."  Under the treaty, therefore, the Fourniers had no discretion to use the property in a manner proscribed by the lease agreement.

We note that it is unclear whether the phrase "the laws of the receiving state" is meant to refer to local Puerto Rican law as well as federal law.  Moreover, it is unlikely that the drafters of the treaty intended that every violation of local or federal law would translate into a breach of the treaty itself.  We need not resolve those questions, however, because even if we adopt the Fagots' reading of the treaty, it does not follow that the Fourniers' actions were non-discretionary.

Treaty or no treaty, the Fourniers were bound to comply with United States law, both local and federal. The treaty does not impose any special obligations on foreign officials; nor does it "specifically prescribe[] a course of action" for such officials to follow when setting up a Consulate in the United States. Berkovitz, 486 U.S. at 536. A general obligation to avoid unlawful activity -- applicable to everyone in the United States -- is hardly sufficient to remove all room for choice. See Shansky v. United States, 164 F.3d 688, 691 (1st Cir. 1999) (concluding that "statements at [a high] level of generality do not satisfy . . . Berkovitz's specific prescription requirement"). A more specific directive is required before we can conclude that the Fourniers' conduct was non-discretionary in the sense that it was not "the product of judgment or choice." Berkovitz, 486 U.S. at 536.[7]

The Fagots' argument suffers from a still more basic flaw. Although they acknowledge that the Fourniers had

_____

[7] The Fagots also argue that, under the Foreign Missions Act ("FMA"), 22 U.S.C. § 4304(b), Costa Rica was obligated to acquire any "benefits" in the United States -- including "the acquisition of real property by purchase [or] lease" -- only through the Secretary of State. They point out that there is no evidence that the Fourniers complied with that provision. However, § 4304(b) provides only that "[i]f the Secretary determines that such action is reasonably necessary on the basis of reciprocity or otherwise . . . then the Secretary may require a foreign mission . . . to obtain benefits from or through the Secretary." (Emphasis added.) Thus, if the Secretary of State has not exercised his authority under § 4304 -- and the Fagots do not argue that he has -- then there is no basis for the claim that the Fourniers violated the FMA by failing to obtain the Secretary's consent before entering into the lease agreement.

-16-

discretionary authority in general, they maintain that the Fagots had no discretion to violate Puerto Rican landlord-tenant or trespass law. The crux of their claim, therefore, is that the Fourniers' actions were non-discretionary because they were wrongful.

That argument conflates an abuse of discretion with an absence of discretion. The discretionary function exception explicitly extends to abuses of discretionary authority. See 28 U.S.C. § 1605(a)(5)(A) (excepting claims based on the exercise of discretion "regardless of whether the discretion be abused"). "The exercise of discretion could not be abused without negligence or a wrongful act." Dalehite, 346 U.S. at 33. Accordingly, the fact that the Fourniers' actions may have been wrongful under Puerto Rican law governing landlord and tenant relationships cannot, by itself, render those actions non-discretionary.

Indeed, the Fagots' interpretation reads the discretionary function exception out of the statute entirely. As explained above, the exception functions as a limitation on the general rule that a foreign sovereign is susceptible to suit for the tortious acts of its employees. The only cases in which the exception can possibly apply are those in which a foreign sovereign or one of its agents or employees is accused of a wrongful, tortious act. Thus, if a tortious act were, by definition, non-discretionary, the discretionary functions exception would be a dead letter. See Fagot Rodriguez IV, 139 F. Supp. 2d at 190 n.16 (noting that the Fagots' argument "effectively means that Costa

-17-

Rica, as a result of that innocuous clause [in the treaty], may never enjoy sovereign immunity in any claim dealing with embassy property and real estate since any claim for money damages under the FSIA would obviously be founded on a violation of the law"). We reject such a reading of the statute, and conclude that the Fourniers' conduct was "discretionary" in the sense that it involved an element of judgment or choice.

We turn, therefore, to the second prong of the test, and ask whether the Fourniers' choices were the type that the discretionary function exception was designed to protect. As we have explained in the context of the FTCA, the critical question here is "whether the acts or omissions that form the basis of the suit are susceptible to a policy-driven analysis" or, put differently, "whether some plausible policy justification could have undergirded the challenged conduct." Shansky, 164 F.3d at 692; accord United States v. Gaubert, 499 U.S. 315, 325 (1991) (explaining that "[t]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion . . . , but on the nature of the actions taken and on whether they are susceptible to policy analysis"). The Fourniers' decisions regarding the Consulate satisfy that standard. The initial choices as to whether, where, and how to set up the Consulate clearly implicated policy issues. See MacArthur Area Citizens Ass'n v. Rep. of Peru, 809 F.2d 918, 922 (D.C. Cir. 1987) ("It is beyond serious question that establishing a chancery in the District of Columbia to conduct foreign relations is a discretionary public policy decision and

-18-

that this decision undergirds the specific acts which the Association bewails."); cf. Joseph, 830 F.2d at 1020 n.1, 1027 (concluding that "the acquisition and operation of [a consular residence] was a discretionary policy decision," but finding that tenants' "purely destructive acts" -- including extensive damage to the property and the removal of fully grown trees, appliances, furniture, light fixtures, shutters and drapes -- "can hardly be considered part of [that] policy decision"). The same is true of the Fourniers' actions in the summer of 1993, when they were confronted with early termination of the lease agreement and the Fagots' demand for $5,000 monthly rent. As the district court explained:

> [A]n evaluation of the range of alternatives available to the [Fourniers] at the time of the June termination notice reveals that there were countervailing political and economic costs and benefits attendant to each course of action. Perhaps Costa Rica and the consuls could have moved the Consulate to a different building, increased their diplomatic relations budget, temporarily shut down the Consulate or scrapped it altogether. However, the Court cannot sit in de novo review and select a lawful alternative that would have been superior.

Fagot Rodriguez IV, 139 F. Supp. 2d at 190.

We agree, and hold that the Fagots' trespass claims are "based upon the exercise or performance or the failure to exercise or perform a discretionary function." 28 U.S.C. § 1605(a)(5)(A). As such, they are excluded from the exception to immunity for tortious activity.

**C.      Immovable Property**

The Fagots contend that their claims fall within the exception to sovereign immunity for "any case in which . . . rights in immovable property situated in the United States are at issue." Id. § 1605(a)(4).  The district court disagreed, reasoning that the immovable property exception extends only to actions involving rights to "actual possession or title." Fagot Rodriguez IV, 139 F. Supp. 2d at 195.  Neither of those rights is at issue here:  none of the defendants has used or possessed the Fagots' property since October of 1994, and they never challenged the Fagots' title. Thus, the only right at stake is the Fagots' right to compensation for non-payment of rent or for trespass.  Like the district court, we conclude that purely compensatory rights, without more, are insufficient to sustain jurisdiction under the immovable property exception.

The legislative history to the FSIA indicates that the immovable property exception was intended to codify existing international practice.  See House Report, supra, at *20.  Under that practice, a foreign sovereign generally was not immune from "an action to obtain possession of or establish a property interest in immovable property located in the territory of the state exercising jurisdiction."  Restatement (Second) of Foreign Relations Law of the United States § 68(b) (1965), quoted in Asociacion de Reclamantes v. United Mexican States, 735 F.2d 1517, 1521 (D.C. Cir. 1984).  However, the exception to immunity for claims involving immovable property did not extend to cases, such

-20-

as slip-and-fall suits seeking damages for injury suffered on a foreign state's property, in which the state's title or rights of use and possession were not contested. See Restatement, supra, § 68(b) cmt. d.

The traditional real property exception was founded on the view that "[a] territorial sovereign has a primeval interest in resolving all disputes over use or right to use of real property within its own domain." Asociacion de Reclamantes, 735 F.2d at 1521. Such disputes not only implicate core sovereignty interests; they also raise questions of institutional competence. Put simply, foreign courts typically are "not well equipped to decide property interests or rights to possession with regard to land outside their jurisdiction, particularly land located in a foreign nation." Id. Thus, it is important for property disputes to be adjudicated by local courts, notwithstanding foreign sovereign immunity.

Those concerns suggest that the immovable property exception "was not intended broadly to abrogate immunity for any action touching upon real estate." MacArthur Area Citizens Ass'n, 809 F.2d at 921. Rather, like the traditional exception it was intended to codify, its purpose is to permit jurisdiction in cases where the United States' interests in adjudicating the dispute are particularly strong. It is difficult to understand how a simple contract dispute over nonpayment of rent -- without more -- falls within that category. The Fagots do not cite, nor can we find, any case so holding. To the contrary, courts have construed the immovable property exception to apply only in cases that implicate

-21-

rights of ownership, use, or possession. <u>See</u>, <u>e.g.</u>, <u>City of</u> <u>Englewood</u> v. <u>Socialist People's Libyan Arab Jamahiriya</u>, 773 F.2d 31, 36 (3d Cir. 1985) (describing immovable property exception as a "title dispute exception" codifying "the recognized principle of international law that a sovereign may resolve disputes over title to real estate within its geographic limits"); <u>cf.</u> <u>Logan</u> v. <u>Dupuis</u>, 990 F. Supp. 26, 29 (D.D.C. 1997) (interpreting the analogous exception to diplomatic immunity to exclude suits for breach of a rental contract).

In support of their expansive reading of the immovable property exception, the Fagots point to the legislative history of the FSIA. They emphasize certain language in the House Report suggesting that the pre-existing real property exception to sovereign immunity extended to suits involving "questions of ownership, <u>rent</u>, servitudes, and similar matters." House Report, <u>supra</u>, at *20 (emphasis added).[8] We do not believe that one passing reference to "rent" in the legislative history is sufficient to show that Congress intended the immovable property exception to apply broadly to garden-variety contract disputes in which title or possession is not in dispute. As the court explained in <u>Asociacion de Reclamantes</u>, 735 F.2d at 1522 n.5, "actions for rent frequently involve issues of title and possession." Thus, the reference to "rent" in the House Report

---

[8] Specifically, the House Report stated that such suits "seem to be permitted" under the Vienna Convention on Diplomatic Relations, which exempts diplomatic or consular property from "search, requisition, attachment or execution." House Report, <u>supra</u>, at *20 (internal quotation marks omitted).

"does not establish any departure from the traditional principle that the real estate exception to sovereign immunity is bounded by concern for those issues." Id.

The Fagots also rely on the Restatement (Third) of Foreign Relations § 455, cmt. b, which states that the immovable property exception includes "controversies concerning payment of rent, taxes, and other fees concerning [consular premises]." Like the legislative history, however, the Restatement is silent on the question whether such controversies are cognizable when they involve only the payment of rent or other debts. Comment b to § 455 states in full:

> Title to land and to buildings on land traditionally is subject to adjudication by the courts of the state where the land is situated. The fact that the land (or buildings, apartments, or appurtenances) in controversy is owned or leased by a foreign state does not detract from the desirability of adjudicating controversies in local courts. Premises used for an embassy, consulate, or diplomatic mission come under this rule, so that controversies relating to rights of ownership, possession, occupation, or use, as well as controversies concerning payment of rent, taxes, and other fees concerning such premises are subject to adjudication in local courts.

The phrase "as well as" certainly could mean that "controversies concerning the payment of rent" can, by themselves, support jurisdiction under the immovable property exception. However, it also could mean that a plaintiff can recover "rent, taxes, and other fees" in the process of adjudicating "rights of ownership, possession, occupation or use." The latter reading finds support in the first sentence of the comment, which emphasizes the

-23-

traditional importance of settling questions about "title" to real property. Although actions for rent sometimes involve such questions, a simple controversy over the breach of a rental contract -- unaccompanied by issues of ownership, possession, or use -- usually will not implicate the special concerns regarding real property located on United States territory.

We conclude that the immovable property exception applies only in cases in which rights of ownership, use, or possession are at issue. As noted, those rights are not implicated here: the defendants voluntarily vacated the property in October of 1994, and they never questioned the Fagots' ownership. The only remaining dispute concerns Costa Rica's liability for non-payment of rent. The peculiar circumstances of this case should not obscure the fact that such a dispute is, first and foremost, a contract dispute. Thus, plaintiffs seeking to recover unpaid rent usually will be able to proceed under the commercial activity exception to foreign sovereign immunity.

That approach may fail where -- as here -- the foreign sovereign did not in fact agree to pay the rent demanded. However, the possibility that jurisdiction will be lacking in some cases should not lead us to adopt an unduly broad reading of the immovable property exception. The very purpose of the FSIA is to restrict the class of cases in which United States courts can adjudicate claims against foreign sovereigns. As we have seen, each of the exceptions to the FSIA has its own specific requirements designed to identify cases in which immunity is or is

not appropriate. Plaintiffs should not be allowed to circumvent those requirements simply because their claims are somehow related to real property.

## III.

One final matter requires our attention. The Fagots claim that Costa Rica failed to produce certain documents in its possession relevant to the exceptions for commercial and tortious activity. They argue that the district court erred in entering judgment "without affording [the Fagots] an opportunity to conclude jurisdictional discovery" as to those exceptions, and without imposing sanctions on Costa Rica for its failure to comply with the Fagots' discovery requests. See Fed. R. Civ. P. 37(d) (authorizing sanctions for discovery misconduct). "We review a district court's handling of pretrial matters, including discovery, for an abuse of discretion." Cummings v. Standard Register Co., 265 F.3d 56, 68 (1st Cir. 2001); see also Guex v. Allmerica Fin. Life Ins. & Annuity Co., 146 F.3d 40, 41 (1st Cir. 1998) (explaining that district court's decisions regarding sanctions under Rule 37 are subject to abuse of discretion review). Assuming, arguendo, that the requested documents might have been important in establishing an implied contract or a non-discretionary tort, we find no abuse here.

The Fagots do not seriously dispute that the district court gave them an adequate opportunity to conduct discovery. They argue instead that the court did not do enough to ensure that Costa Rica responded to their requests for documents. However, they have

given us no basis to believe that any problem existed for the district court to remedy. Costa Rica insists that it turned over all the documents in its possession, and the Fagots have not suggested any reason why we should doubt that claim.

Nor did the Fagots present a coherent claim of discovery abuse to the district court. As noted above, the court first entered summary judgment for Costa Rica and the Consulate in its 1996 decision in Fagot Rodriguez I. The Fagots moved for reconsideration and for additional discovery, and the court allowed them 60 days for discovery on the commercial and tortious activity exceptions. At that point, the Fagots submitted a request for documents, which they claim Costa Rica ignored. (Costa Rica responds that the request mirrored an earlier request for production, with which they already had complied fully.) Although the Fagots mentioned the matter at a hearing in 1997 -- prior to the court's decision in Fagot Rodriguez II -- they never lodged a formal objection regarding Costa Rica's alleged non-compliance, or moved to compel disclosure under Rule 37(a)(2). Instead, they forged ahead with their motion for summary judgment, relying on facts obtained through a request for admissions. Indeed, between the hearing in 1997 and the court's final decision in 2001, the Fagots did not mention the discovery issue. Given that history, we have no trouble concluding that the district court did not abuse its discretion by failing to take some unspecified initiative directed at some unspecified discovery abuse by Costa Rica.

**Affirmed**.