LYNCH, Circuit Judge, dissenting.
In this important case affecting this country's foreign relations, I respectfully disagree with my colleagues. The majority holds that Canada is stripped of its sovereign immunity under the commercial activity exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 et seq. I disagree.
This suit is based on Merlini's disagreement with the decision of her employer, the Canadian consulate in Boston, not to provide her with extended workers' compensation benefits, having provided her with basic benefits. That decision by Canada is required by a Canadian legislative act, under which Canada has chosen to provide its own workers' compensation system to all consulate employees, regardless of nationality. I believe Canada's actions are protected from suit by the FSIA. Even if the suit could be viewed as based not on a legislative act, but only on an administrative act by Canada in its decision not to give Merlini an extension on her benefits, Canada is still protected by sovereign immunity.
Further, I think the policy implications of the majority's view are grave. What is *40 sauce for the Canadian goose under the majority's holding will prove to be a bitter sauce for the American gander. The majority view will, I believe, operate to the detriment of the United States. Compelling Canada to abide by Massachusetts state law, at the expense of maintaining its own workers' compensation scheme, will redound to the harm of the U.S. government's functions abroad, as I discuss later.
Because a sovereign state is "presumptively immune from the jurisdiction of United States courts" under the FSIA, Saudi Arabia v. Nelson, 507 U.S. 349, 355, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993), the burden falls upon Merlini to demonstrate that an exception applies, see Universal Trading & Inv. Co. v. Bureau for Representing Ukrainian Interest in Int'l & Foreign Courts, 727 F.3d 10, 17 (1st Cir. 2013) (citing Virtual Countries, Inc. v. Republic of S. Afr., 300 F.3d 230, 241 (2d Cir. 2002) ). I agree with the district court that this burden has not been met. See Merlini v. Canada, 280 F. Supp. 3d 254, 258 (D. Mass. 2017). I set out my reasons below.[9]
I.
I first consider the text and meaning of the FSIA. The FSIA, enacted in 1976, "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." Sullivan v. Republic of Cuba, 891 F.3d 6, 9 (1st Cir. 2018) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ). According to the Supreme Court, "the [FSIA's] manifest purpose [is] to codify the restrictive theory of foreign sovereign immunity." Nelson, 507 U.S. at 363, 113 S.Ct. 1471.[10] In a case cited approvingly by the Nelson Court, the Second Circuit carefully laid out the scope of the restrictive theory, which safeguards immunity for "traditionally ... quite sensitive" actions including "internal administrative acts" and "legislative acts." Victory Transp. Inc. v. Comisaria Gen. de Abastecimientos y Transportes, 336 F.2d 354, 360 (2d Cir. 1964). And the Nelson Court quoted from a much-cited law review article by a leading commentator, stating, "[S]uch acts as legislation ... cannot be performed by an individual acting in his own name. They can be performed only by the state acting as such." Nelson, 507 U.S. at 362, 113 S.Ct. 1471 (quoting Hersch Lauterpacht, The Problem of Jurisdictional Immunities of Foreign States, 28 Brit. Y.B. of Int'l L. 220, 225 (1952)).
Under the FSIA's commercial activity exception, a foreign state is not immune from suit in a case
in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state *41 elsewhere and that act causes a direct effect in the United States.
28 U.S.C. § 1605(a)(2).[11]
As the first step in considering this exception, we must "identify[ ] the particular conduct on which [Merlini's] action is 'based' for purposes of the [FSIA]." Nelson, 507 U.S. at 356, 113 S.Ct. 1471. This requires "zero[ing] in on the core of the[ ] suit," OBB Personenverkehr AG v. Sachs, --- U.S. ----, 136 S. Ct. 390, 396, 193 L.Ed.2d 269 (2015), without focusing merely on "a single element of a claim," id. at 395.[12] That is, a court must identify the "gravamen of the complaint." Id.
Here, when we properly "zero[ ] in on the core of [Merlini's] suit," id. at 396, we see that it was the sovereign decision by Canada to enact and administer its own compensation scheme, including for all workers at consulates,[13] that is the basis for plaintiff's claim of injury. Merlini seeks more in the way of workers' compensation than Canada has provided. I disagree with the majority's characterization of Canada's conduct as being "an employer's failure ... to be insured" under state law, as though Canada were a private employer making a discretionary, market-based choice.[14] The majority concludes that this *42 is an ordinary commercial omission made by an employer who "take[s] the risk of going bare." Thus, the majority asserts that Merlini's claim is "in no sense 'based on' Canada's decision to compensate her through its own national workers' compensation scheme." In my view, the premise is wrong, and the conclusion is wrong.
To see why, one need only look to Canada's Government Compensation Act ("GECA"), R.S.C. 1985, c. G-5. That Canadian statute not only establishes the exclusive framework for how local consulate staff, like Merlini, receive benefits, but it also sets forth the sole mechanism for appealing the denial of such benefits. Accordingly, the GECA sets forth what the government of Canada has determined, in its sovereign discretion, to be the appropriate comprehensive workers' compensation scheme for all of its federal employees, at home and abroad. It does not matter, as the majority posits, that Merlini held only an administrative position: The GECA clearly applies to all "locally engaged" employees. See id. § 7(1).
Important here, the GECA authorizes the government of Canada to compensate workplace injuries only through the Canadian Consolidated Revenue Fund (if a local fund exists in the jurisdiction where the injury occurred), see id., or directly through the government of Canada, see id. § 7(2). The Act does not authorize any other means of compensation. As such, Canada, as Merlini's employer, was prohibited by law from purchasing local Massachusetts insurance. Nothing under the FSIA required the Canadian consulate to flout its own Canadian laws. Contrary to the majority, this issue is not, then, one of "motivation," but of a sovereign choice by Canada's legislature untethered from commercial activity (unlike, for example, the issuance and repayment of bonds).
To enforce Canada's uniform compensation scheme, the consulate had to forgo Massachusetts workers' compensation insurance. These "acts" -- of enforcing the Canadian uniform compensation scheme and of foregoing Massachusetts workers' compensation insurance -- are the same. It is mere semantics to disaggregate the two. Following the Supreme Court's interpretations in Nelson [15] and Sachs, then, Merlini's suit is "based upon" Canada's enforcement and administration of a uniform compensation scheme, and not merely one aspect of Canada's conduct in enforcing and administering this scheme.
II.
The second step of the commercial activity inquiry requires determining whether the conduct that the complaint is "based upon" is commercial rather than sovereign. The FSIA defines commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Thus, courts must assess "whether the particular actions that the foreign state performs ... are the type of actions by which a private party engages in 'trade and traffic or commerce.' "
*43 Republic of Argentina v. Weltover Inc., 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (quoting Black's Law Dictionary (6th ed. 1990)). Weltover requires that the "full context" be considered. Id. at 615, 112 S.Ct. 2160.
The majority asserts that Canada's conduct cannot be framed as a Canadian legislative directive to have and enforce its own workers' compensation scheme because that goes to the "purpose" of Canada's conduct, and not its "nature." See 28 U.S.C. § 1603(d). I disagree. Although it can be "difficult ... in some cases to separate 'purpose' (i.e., the reason why the foreign state engages in the activity) from 'nature' (i.e., the outward form of the conduct that the foreign state performs or agrees to perform)," Weltover, 504 U.S. at 617, 112 S.Ct. 2160 (emphasis omitted), that distinction here supports my view.
The "outward form of [Canada's] conduct" includes, among other things, informing Merlini that she was subject to the GECA (this was done before her accident and injury),[16] compensating her pursuant to the GECA's benefits scheme after she made a claim of injury, and not continuing her benefits when Canada's Workplace Safety and Insurance Board (WSIB) determined after a full process that Merlini was ready to return to work. Each of these actions was authorized, and, indeed, compelled by the GECA. I cannot see how a country enacting its own law as to its employees and then administering its own national compensation scheme under that law as to those employed at its embassies and consulates is not, by its "nature," a sovereign act. Put another way, the full administration of this scheme is not the "justification for the conduct by Canada on which Merlini's claim is based," it is the relevant conduct by Canada. The majority asserts that this conduct is "simply immaterial," and we should treat Canada, a sovereign state, simply as an "employer" who just "did not comply with the state's workers' compensation requirements." I disagree, and view this conduct as clearly material to Merlini's claim.[17] The majority, then, narrowly focuses on Merlini's employment and Canada's failure to have workers' compensation insurance under Massachusetts state law, which I do not see as the relevant "course of conduct": Canada's sovereign, full administration of its workers' compensation scheme.
The majority thrice cites to a single sentence in the House Report about "employment or engagement" of clerical staff, as though it provides support for its conclusion. See H. Rep. No. 94-1487, at 16 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6615. It does not.
The full text of that paragraph of the report states:
The courts would have a great deal of latitude in determining what is a '[commercial] activity' for purposes of this bill. It has seemed unwise to attempt an excessively precise definition of this *44 term, even if that were practicable. Activities such as a foreign government's sale of a service or a product, its leasing of property, its borrowing of money, its employment or engagement of laborers, clerical staff or public relations or marketing agents, or its investment in a security of an American corporation, would be among those included within the definition.
Id. This history does not support the majority's use of it. This case is not about whether Canada complied with local law when it hired Merlini. No such dispute is before us. Merlini was hired; this dispute is about workers' compensation and Canada's choice of the workers' compensation it provides for its employees. Nothing in the legislative history says that any dispute about post-employment compensation for workplace injuries is within the exception for commercial activity. This case is about Canada's sovereign choice of a comprehensive workers' compensation scheme (a scheme which did compensate Merlini). Canada chose to cover all people employed at its consulates, whether U.S. citizens or nationals of other countries, under its own scheme.
Further, Canada's action is not the "type of action[ ] ... which a private party [would] engage[ ] in," id. at 614, 112 S.Ct. 2160. That is so because no private party can administer such a national statutory scheme.
My understanding comports with the Supreme Court's holding and reasoning in a series of cases. In Weltover, the Court held that Argentina's issuance of bonds known as "Bonods" was a commercial act, even though its purpose was to restructure the country's debt, 504 U.S. at 609-10, 112 S.Ct. 2160, because the government was acting "not as regulator of [the] market, but in the manner of a private player within it." Id. at 614, 112 S.Ct. 2160. The Court looked at the "full context," id. at 615, 112 S.Ct. 2160, and pointed to the fact that private parties regularly held and traded such "garden-variety debt instruments." Id.
In this case, the very opposite is true: The Canadian consulate's decision to comply with and enforce the workers' compensation scheme established by the GECA is precisely "the type of action[ ]" that a "regulator," not a private employer, engages in. Id. at 614, 112 S.Ct. 2160. To be sure, a private employer can forgo purchasing workers' compensation insurance, but unlike Canada, it does not and cannot do so as part and parcel of enforcing a broader statutory scheme.
Next, in Nelson, the Court firmly rejected the argument that the recruitment and employment by Saudi Arabia of foreign nationals -- which was arguably a commercial activity, and may have led to the commission of intentional torts which injured the plaintiffs -- satisfied the commercial activity exception. 507 U.S. at 351, 113 S.Ct. 1471. That is, the Court explicitly rejected the argument that no more was required than "a mere connection with, or relation to, commercial activity." Id. at 358, 113 S.Ct. 1471.
The Nelson court emphasized that "a foreign state engages in commercial activity for purposes of the restrictive theory only where it acts 'in the manner of a private player within' the market." Id. at 360, 113 S.Ct. 1471 (quoting Weltover, 504 U.S. at 614, 112 S.Ct. 2160 ). The Court cited several federal cases, some pre-FSIA, for the proposition that immunity extends "to a foreign state's 'internal administrative acts.' " Id. at 361, 113 S.Ct. 1471 (quoting Victory Transport, 336 F.2d at 360 ); see Herbage v. Meese, 747 F. Supp. 60, 67 (D.D.C. 1990), aff'd, 946 F.2d 1564 (D.C. Cir. 1991) ; see also *45 Heaney v. Gov't of Spain, 445 F.2d 501, 503 (2d Cir. 1971) (reiterating immunity for legislative acts and administrative acts); Isbrandtsen Tankers, Inc. v. President of India, 446 F.2d 1198, 1200 (2d Cir. 1971) (same). Whether viewed as primarily legislative or administrative, Canada's conduct here remains sovereign.
The majority opinion, in my view, is also inconsistent with the Court's prior precedent and other circuit precedent. This circuit and others have rejected the majority's implicit premise that the nature of an action can be determined by an abstract consideration of whether some aspects of the broader governmental conduct are like those "which a private party engages in [during] 'trade and traffic or commerce.' " Weltover, 504 U.S. at 614, 112 S.Ct. 2160. In my view, private parties cannot create governmental workers' compensation schemes and so Canada's actions are not like those of private employers. But even if there were some likenesses to a private employer's decision to self-insure, that would not be enough to strip Canada of its immunity under fairly settled FSIA law.
Several circuits have correctly found that even where government conduct is determined to be like that in which private parties can and do engage, the government conduct remains sovereign when performed as part of a broader governmental program.
I think the majority's view is in conflict with the Second Circuit decision in Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek, 600 F.3d 171 (2d Cir. 2010). There, the Second Circuit held that an Indonesian state-owned insurer was entitled to sovereign immunity against a negligent supervision claim because neither Indonesia nor its state-owned insurer was engaged in a commercial activity. Id. at 176. Even if the insurer were arguably involved in a commercial activity overall, the challenged activity (negligent supervision) was not sufficiently connected to commerce. Id. at 179. That is, the state-owned insurer's "hiring, supervision, and employment of" individuals as part of a comprehensive national health insurance program was not a commercial act. Id. at 178.
The Second Circuit's first holding was that the sovereign there, Indonesia, "does not sell insurance to workers or to employers in any traditional sense and does not otherwise compete in the marketplace like a private insurer." Id. at 177 (internal quotation marks omitted). Thus, it held that Indonesia's insurance scheme does not equate to that of an independent actor in the private marketplace of potential health insurers. Instead, it determined that "the administration of Indonesia's national health insurance program" was "sovereign in nature." Id. at 178. Here, Canada also does not compete in the marketplace as either seller or buyer, nor does it offer its workers' compensation program to private employees.
The Second Circuit's second holding was that "even if ... administration of Indonesia's national health insurance program and [the state-owned insurer's] employment ... were commercial in nature," the FSIA would not allow "abrogat[ing] a foreign sovereign's immunity solely on the basis of an employment relationship." Id. at 179. The majority attempts to distinguish Anglo-Iberia on this second holding, saying "the claims [there] were based on the defendants' administration of the government programs at issue," as it was "the manner of the administration ... that was alleged to be wrongful." It is, at minimum, the administration by Canada of its own workers' compensation scheme that is at issue here, too.
And my view is that Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan further supports my point: The fact that actions can be done by private actors does not mean *46 the actions fall within the commercial activity exception where such actions were nevertheless "uniquely sovereign in nature." 115 F.3d 1020, 1030 (D.C. Cir. 1997). There, the two officials who saw to the provision of the plaintiff's healthcare were "performing their official tasks as administrators of a government [health and welfare] program." Id. As here, then, the sovereign actions involved the "administrat[ion] of a government program [for health and welfare]." Id.
I also view the majority's conclusion as being at odds with rulings by the Ninth Circuit and D.C. Circuit. In Gregorian v. Izvestia, the Ninth Circuit held that the Soviet Union was entitled to sovereign immunity against a libel claim regarding a state-controlled newspaper. 871 F.2d 1515, 1522 (9th Cir. 1989). That the newspaper was sold and distributed in the United States did not render commercial the nature of its publication and distribution, as the "writing and publishing of articles reporting or commenting on events" remained governmental because the paper was state-owned and operated. Id. The D.C. Circuit held similarly that Peru was entitled to sovereign immunity for remodeling and operating a building as a chancery allegedly in violation of local District of Columbia zoning laws, because the operation of a chancery was "by its nature governmental." MacArthur Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918, 920 (D.C. Cir. 1987) (citation omitted).
In my view, it is incorrect to say that Merlini's claim is "no different from the claims that other employees have brought against private businesses that ... have not insured themselves" under Massachusetts law. It is analytically incorrect, partly because the broader context must matter as to statutory interpretation and application of the FSIA. If that broader context did not matter, almost any governmental act could be disaggregated and framed as commercial conduct that a private party can perform.
Since what Canada has done here is a governmental act by its very nature, the majority cannot rely on Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic, 877 F.2d 574 (7th Cir. 1989), even if the case (whether rightly or wrongly decided) bears some initial resemblance. There, the Greek government was alleged to be in breach of a contract to reimburse physicians and an organ bank in Chicago for performing kidney transplants on Greek nationals. Id. at 575. The Seventh Circuit held that Greece's execution of the contract constituted "commercial activity," even though it was done to fulfill the government's constitutional goal of caring for the health of Greek citizens, because "nothing about the provision of and payment for health services ... is uniquely governmental." Id. at 581.
Not so here. Canada's conduct, its enactment of a comprehensive workers' compensation scheme and decision not to award extended benefits, is the conduct at issue, and it is "uniquely governmental." Id. It is one thing for a government to engage in a private, commercial act (such as executing a contract) in order to fulfill a general governmental purpose (such as providing healthcare to its citizens).[18] It is quite another for a government to act in a *47 manner strictly and precisely compelled by its own law to maintain the uniformity of its own federal workers' compensation program. This distinction is important.
I return to my sense of the foreign policy repercussions of the majority's view. The U.S. has undertaken the same sovereign exercise abroad as to providing workers' compensation for U.S. embassy and consulate employees as has Canada. For over a century, the U.S. has had a workers' compensation scheme for federal workers under the Federal Employees' Compensation Act ("FECA"), 5 U.S.C. § 8101 et seq. FECA expressly covers "noncitizens and nonresidents" who are employees of the United States, such as employees at U.S. embassies and consulates abroad. See id. § 8137. The State Department tells us that "many foreign nationals employed by U.S. embassies and consulates - including Canadian citizens employed by the United States in Canada - are currently entitled to workers' compensation benefits in virtue of United States law, not local law." Like the GECA, U.S. law mandates that noncitizen, nonresident federal workers employed abroad are subject to federal U.S. workers' compensation law and procedures. See id. In addition to this statutory command, State Department regulations establish a "special schedule" for the compensation of such embassy and consulate workers, except in narrow circumstances. 20 C.F.R. § 25.2(b).
To say, then, that Canada is acting in a "commercial" manner when it imposes its own workers' compensation scheme would lead to the conclusion that our government's like actions as to employees of embassies and consulates abroad are similarly commercial, not sovereign. That, in my view, cannot be right. A decision that Canada's actions are merely commercial risks providing cover for other countries to ignore sovereign actions taken by the U.S. and allow liability against the U.S. government concerning workers' compensation under local laws. Indeed, the State Department's filing expresses concern with the U.S. "fac[ing] increased exposure in similar claims abroad." I think it highly unlikely that Congress intended such a result in drafting the FSIA. The effect of the majority's holding is to abrogate Canada's immunity from suit and force it to face a claim that Massachusetts can require Canada to get local insurance when Canada has made a sovereign decision to provide insurance itself through a comprehensive scheme.
Further, Merlini cannot escape from the fact that she is challenging Canada's imposition of its own compensation scheme in lieu of purchasing Massachusetts workers' compensation insurance. The majority finds little significance in the fact that Canada provided Merlini with compensation through Canada's own workers' compensation system. Pursuant to the GECA, Merlini received compensation, in the form of full payment of her salary, from March until October 2009. At that point, the WSIB determined that Merlini was able to return to work and terminated her benefits. Merlini chose not to appeal, which was open to her, and instead began a decade-long legal battle in the U.S. to obtain additional benefits from Massachusetts and from Canada.
*48 Finally, the majority also "emphasize[s]" throughout that Merlini is an American citizen, and states that it reaches its conclusion because of that fact. But that cannot limit the reach of its opinion in any way. The Massachusetts insurance statute, by its terms, applies to workers of all nationalities employed locally, not just U.S. citizens. So, by that logic, even the consulate's Canadian employees are subject to the state statute. The majority's attempt to cabin its opinion by stressing that Merlini is an American citizen does not work for yet another reason. The majority's attempted distinction based on citizenship of Canada's consular employees creates incentives to discourage Canada from employing Americans in its consulate, and imposes on Canada the costs and paperwork of administering different workers' compensation systems. In turn, the majority's attempted distinction would discourage American embassies abroad from employing local foreign citizens due to post-employment application of local workers' compensation law. But the choice to employ such citizens and the mix of the nationalities of employees at such consulates and embassies are sovereign choices.
If the majority thinks, as it says it does, that its result here, a denial of sovereign immunity, can be limited to low-level, "purely clerical" workers, I think that is mistaken. The logic of its analysis leaves no room for that. Further, there is no support in the text of the statute or the Supreme Court caselaw for such a distinction. The same is true for any attempted limitation based on Merlini's American citizenship.
The purpose of sovereign immunity is to leave sovereign issues to the sovereigns, not to the courts. I respectfully dissent.

I do agree with, and join, the majority in rejecting the State Department's arguments in its amicus brief that (1) Merlini's complaint is based only on the negligent conduct of her fellow employee in laying the phone cord that Merlini tripped over and so (2) we should vacate and remand for Merlini to make a negligence claim under the noncommercial tort exception. But, as discussed later, I agree with aspects of the State Department's brief, particularly concerning this country's activities abroad.

Indeed, just months before the passage of the FSIA, the Supreme Court noted that "it is fair to say that the 'restrictive theory' of sovereign immunity appears to be generally accepted as the prevailing law in this country." Alfred Dunhill of London, Inc. v. Republic of Cuba, 425 U.S. 682, 703, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

The majority states correctly that its holding on the commercial activity exception, see 28 U.S.C. § 1605(a)(2), "precludes the noncommercial tort exception from applying." See id. § 1605(a)(5).
I consider the noncommercial tort exception briefly on the merits here. As the district court pointed out, the noncommercial tort exception expressly does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A) ; see Fagot Rodriguez v. Republic of Costa Rica, 297 F.3d 1, 8 (1st Cir. 2002) ; Merlini, 280 F. Supp. 3d at 258. Canada's decision to enact a particular workers' compensation scheme clearly is a discretionary legislative decision and is a decision "based on considerations of public policy." Berkovitz v. United States, 486 U.S. 531, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). Following the Supreme Court, we must avoid "judicial 'second guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). Thus, Merlini's argument that Canada's conduct falls within the exception for noncommercial torts is unavailing.

In Sachs, the Court unanimously held that the commercial exception did not apply to a claim concerning a grievous injury from a rail accident in Austria, and did not permit jurisdiction over the foreign state-owned railway. 136 S. Ct. at 393. The Court rejected the Ninth Circuit's reading of Nelson -- that the commercial activity exception was properly met so long as a single element of the claim met the exception -- and said again that courts must focus on the acts of the sovereign alleged to have injured the plaintiff. "[T]he mere fact that the sale of the Eurail pass would establish a single element of a claim is insufficient to demonstrate that the claim is 'based upon' that sale for purposes of § 1605(a)(2)." Id. at 395.

Consulates, like embassies, by their operation are not usual places. They embody actions by a sovereign exercising its sovereign powers; the consulate here is an extension of Canada. As Canada says, the "[c]onsulate's mission is to monitor and interpret political and economic issues in the New England area; represent Canadian sovereign interests on issues such as borders, security, and trade; and provide consular services to Canadian citizens in New England, among other functions." I certainly do not say that the FSIA question is resolved by the fact that the accident happened in a consulate and to a person employed by a consulate. But I think the majority gives insufficient attention to these facts.

Canada argues that it does provide workers' compensation and that the chapter 152 definition of "uninsured" or "self-insured" employer is irrelevant to its immunity, contrary to what the majority suggests. And Merlini's complaint argues not that the consulate was uninsured as a factual matter, but that it "was acting as a self-insurer without obtaining a [Massachusetts] license."

In Nelson, discussed further in the following section, the Supreme Court held that the suit was "based upon a sovereign activity immune from the subject-matter jurisdiction of United States courts under the [FSIA]." 507 U.S. at 363, 113 S.Ct. 1471.

Merlini's complaint acknowledges that "the Consulate instructed all its American employees, including Merlini, to apply to the Government of Canada for benefits in the event of a workplace accident."

The majority also says that, "had Canada registered as a self-insurer in compliance with chapter 152, it could have performed each of the 'outward' actions" that I list and "Merlini would not have had a claim that she could bring under Massachusetts law." That counterfactual is not relevant to the majority's assertion that "none of these actions constitutes the 'outward conduct' that forms the basis of Merlini's claim against the Canadian government." The existence of an alternative form of compliance with a Massachusetts statute (or, put another way, a method for a sovereign state to stave off lawsuits) does not change the character of Canada's acts from sovereign to commercial, nor does it mean that these acts are not the relevant conduct by Canada underlying Merlini's claim.

The Seventh Circuit in Rush-Presbyterian stated that "[u]nder the Greek constitution, the government has a broad obligation to provide health care services to Greek citizens." 877 F.2d at 575. The Greek constitution does establish that "the State shall care for the health of citizens and shall adopt special measures for the protection of youth, old age, disability and for the relief of the needy." 2001 Syntagma [Syn.][Constitution] 21 (Greece) (trans). This language seems closer to stating a general sovereign purpose -- caring for health of citizens -- than a direct and precise mandate such as at issue in the GECA.
In furthering this general constitutional goal, the Greek government maintains a wide range of possible options. And indeed, the Greek government has changed the precise cost and provision of healthcare numerous times since Rush-Presbyterian was decided, including, for example, eliminating health insurance for those who had been unemployed for more than two years as part of austerity measures. See Lucy Rodgers & Nassos Stylianou, How bad are things for the people of Greece, BBC News (July 16, 2015), http://www.bbc.com/news/world-europe-33507802.